UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WILLIAM JOHNSON, JILL JOHNSON,
BRIAN MASON, NAOMI MASON, and
SECOND AMENDMENT FOUNDATION,
INC.,                                          No. 17-cv-00124-PLM-TPG

     Plaintiffs,                              HON. PAUL L. MALONEY

v.                                             MAG. TIMOTHY P. GREELEY

NICK LYON, in his official capacity as
Director of the Michigan Department of Health
and Human Services,

     Defendant.
_____/

**AMICUS CURIAE BRIEF OF**
**ATTORNEY GENERAL BILL SCHUETTE**
**IN SUPPORT OF PLAINTIFFS**

Bill Schuette
Attorney General

Aaron D. Lindstrom (P72916)
Solicitor General
LindstromA@michigan.gov

Ann M. Sherman (P67762)
Assistant Solicitor General

David A. Porter (P76785)
Assistant Attorney General

P.O. Box 30212
Lansing, MI 48909
517-241-8403

Dated: November 29, 2017

# TABLE OF CONTENTS

Page

Table of Contents ................................................................................. ii

Index of Authorities ............................................................................. iv

Concise Statement of Issue Presented ................................................ viii

Controlling or Most Appropriate Authority ............................................ ix

Introduction ......................................................................................... 1

Interest of Amicus Curiae ..................................................................... 2

Argument ............................................................................................. 3

I.    Properly read, the Department's Rule prohibits foster parents from carrying a firearm in their home and from storing a firearm in a readily accessible manner and is therefore unconstitutional under *Heller*'s most basic holding. .............................................................. 3

II.   Even under the Department's reading, which would allow foster parents to carry firearms, the Rule fails to pass constitutional muster. .......... 5

      A.    Because it infringes on the core right protected by the Second Amendment, the Rule is unconstitutional under any of the prevailing approaches to analyzing Second Amendment challenges. ................................................................... 5

      B.    The Rule burdens the people, place, and activity historically protected by the Second Amendment. ..................................... 9

            1.    The Rule burdens the core constituency of the Second Amendment—"law-abiding, responsible citizens." ....................... 9

            2.    The Rule burdens the place where the Second Amendment right "is most acute"—the home. ........................... 12

            3.    The Rule prevents foster parents from exercising their protected right to have a firearm "operable for the purpose of immediate self-defense." ........................................ 15

      C.    Under the history-focused approach, the Department's Rule infringes core conduct protected by the Second Amendment and is therefore per se unconstitutional. ...................................... 19

D.    Under the interest-balancing approach of strict scrutiny, the
      Rule also fails. ......................................................................... 20

E.    The Department's Rule fails even under intermediate scrutiny .......... 22

      1.    The Department's undisputed interest in protecting foster
            children cannot override the constitutional judgment,
            embodied in the Second Amendment, that responsible
            citizens can be trusted with firearms. ........................................ 22

      2.    The Department's Rule is not sufficiently tailored to its
            stated objective of protecting foster children from firearm
            fatalities. ..................................................................................... 23

Conclusion and Relief Requested ................................................................. 28

# INDEX OF AUTHORITIES

Page

**Cases**

*Bd. of Trs. of State Univ. of N.Y. v. Fox,*
    492 U.S. 469 (1989) ................................................................ 23, 28

*Byker v. Mannes,*
    641 N.W.2d 210 (Mich. 2002) ..................................................... 4

*Carey v. Brown,*
    447 U.S. 455 (1980) .................................................................. 13

*City of Los Angeles v. Alameda Books, Inc.,*
    535 U.S. 425 (2002) .................................................................. 23

*Detroit Base Coal. for Human Rights of Handicapped v. Dep't of Soc. Servs.,*
    428 N.W.2d 335 (Mich. 1988) ...................................................... 4

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ........................................................... passim

*Dolan v. City of Tigard,*
    512 U.S. 374 (1994) .................................................................. 10

*Fisher v. Univ. of Texas at Austin,*
    133 S. Ct. 2411 (2013) .............................................................. 21

*Florida Bar v. Went For It, Inc.,*
    515 U.S. 618 (1995) .................................................................. 25

*Gregory v. Chicago,*
    394 U.S. 111 (1969) .................................................................. 13

*Heller v. D.C. (Heller II),*
    670 F.3d 1244 (D.C. Cir. 2011) ........................................... 7, 8, 19

*Hobbie v. Unemployment Appeals Comm'n of Florida,*
    480 U.S. 136 (1987) .................................................................. 10

*Koontz v. St. Johns River Water Mgt. Dist.,*
    133 S. Ct. 2586 (2013) .............................................................. 10

*Luis v. United States,*
    136 S. Ct. 1083 (2016) .............................................................. 17

*McCutcheon v. Fed. Election Comm'n,*
    134 S. Ct. 1434 (2014) ..................................................... 23

*McDonald v. City of Chicago, Ill,*
    561 U.S. 742 (2010) .................................................. ix, 6, 12

*McGowan v. Maryland,*
    366 U.S. 420 (1961) ......................................................... 13

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
    700 F.3d 185 (5th Cir. 2012) ........................................... 21

*New York State Rifle & Pistol Ass'n, Inc v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ....................................... 23, 27

*People v. Deroche,*
    829 N.W.2d 891 (Mich. App. 2013) ................................. 16

*People v. Wilder,*
    861 N.W.2d 645 (Mich. App. 2014) ................................. 18

*People v. Yanna,*
    824 N.W.2d 241 (Mich. App. 2012) ................................... 7

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ......................................................... 10

*Regan v. Taxation with Representation of Wash.,*
    461 U.S. 540 (1983) ......................................................... 10

*Turner Broad. Sys., Inc. v. F.C.C.,*
    520 U.S. 180 (1997) ......................................................... 23

*Tyler v. Hillsdale Cty. Sheriff's Dep't,*
    837 F.3d 678 (6th Cir. 2016) .................................... passim

*United States v. Chovan,*
    735 F.3d 1127 (9th Cir. 2013) ...................................... 8, 21

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) ........................................... 14

*Vernonia Sch. Dist. 47J v. Acton,*
    515 U.S. 646 (1995) ......................................................... 12

*Whole Woman's Health v. Hellerstedt*,
  136 S. Ct. 2292 (2016) ................................................................. 20

*Wildauer v. Frederick Cty.*,
  993 F.2d 369 (4th Cir. 1993) ...................................................... 11

**Statutes**

11 R.I. Gen. Laws Ann. § 11-47-60.1 ........................................... 25

Fla. Stat. Ann. § 790.174 ............................................................. 25

Haw. Rev. Stat. Ann. § 134-10.5 ................................................. 25

Mich. Comp. Laws § 14.101 ........................................................... 2

Mich. Comp. Laws § 14.28 ............................................................. 2

Tex. Penal Code Ann. § 46.13 ..................................................... 25

**Other Authorities**

1 Blackstone's Commentaries 300 (1803) ...................................... 6

1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 ...................... 6

3 J. Story, Commentaries on the Constitution of the United States § 1890
  (1833) ............................................................................................ 6

David B. Kopel & Joseph G.S. Greenlee,
  *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis U.L.J. 193
  (2017) ..................................................................................... 7, 16

David B. Kopel et al., *Smart Guns / Foolish Legislators*, Finding the Right
  Public Safety Laws, and Avoiding the Wrong Ones,
  34 Conn. L. Rev. 157 (2001) .................................................... 26

John R. Lott, Jr. & John E. Whitley, *Self-Storage Gun Laws: Accidental
  Deaths, Suicides, and Crime*,
  44 J.L. & Econ. 659 (2001) ................................................. 26, 27

Lifting the Veil – A Critical Look At The Foster Care System: How
  Widespread a Problem?,
  http://www.liftingtheveil.org/foster04.htm ............................. 25

Lois A. Weithorn, *Envisioning Second-Order Change in America's Responses to Troubled and Troublesome Youth*, 33 Hofstra L. Rev. 1305 (2005) .............................................................. 14

Michael B. Mushlin, *Unsafe Havens: The Case for Constitutional Protection of Foster Children from Abuse and Neglect*, 23 Harv. C.R.-C.L. L. Rev. 199 (1988) ...................................................... 26

State of Mich. Dep't of Health and Human Servs., DHS Pub-435, The Foster Child (Nov. 2009) ........................................... 14

*The Federalist* No. 46 (James Madison) (Gideon ed., 2001) ......................................... 1

**Rules**

40 Tex. Admin. Code § 749.2961 .............................................................. 25

Fla. Admin. Code Ann. R. 65C-13.030(3)(j)(6) ........................................... 25

Haw. Code R. 17-891.1-32(6) .................................................................. 25

Mich. Admin. Code r. 400.9415 ............................................................... 3

Mich. Admin. Code r. 400.9415(3) .......................................................... 12

Mich. Admin. Code r. 400.9415(3)(c) ....................................................... 4

R.I. Code R. 14-3-174:1-1.7 .................................................................... 25

**Constitutional Provisions**

Mich. Const. art. I, § 6 ....................................................................... 2, 16

Mich. Const. art. V, § 21 ......................................................................... 2

Mich. Const. art. XI, § 1 .......................................................................... 2

U.S. Const. amend. II ...................................................................... passim

U.S. Const. amend. IV ........................................................................... 11

U.S. Const. amend. V............................................................................. 10

**CONCISE STATEMENT OF ISSUE PRESENTED**

1.      Does the Department of Health and Human Services' regulation requiring foster parents to keep their firearms locked away inoperably violate the Second Amendment right of law-abiding, responsible citizens (individuals whom the Department has vetted and trusted to take care of foster children) to use arms in defense of hearth and home?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*District of Columbia v. Heller*, 554 U.S. 570 (2008).

*McDonald v. City of Chicago, Ill*, 561 U.S. 742 (2010).

## INTRODUCTION

In this country, we trust responsible, law-abiding citizens with guns. As James Madison once wrote, "[T]he advantage of being armed" is something "Americans possess over the people of almost every other nation . . . [where] the governments are afraid to trust the people with arms." *The Federalist* No. 46, at 247 (James Madison) (Gideon ed., 2001).

In this State we trust certain citizens—individuals whom the Michigan Department of Health and Human Services has vetted and believes have the requisite moral fitness and good judgment—to provide a temporary haven for some of the State's most vulnerable children. Given that we trust those individuals with the great responsibility of caring for these children, it makes sense that we would also trust them to do what we trust every other law-abiding citizen to do: exercise responsible gun ownership. Yet for the past sixteen years, the Department has required licensed foster parents to keep the firearms in their home locked away inoperably. However well intentioned, that Rule is unconstitutional.

The Rule's requirement that firearms be kept inaccessible and inoperable prevents foster parents from exercising their right to keep and bear arms for self-defense in the home. By burdening the people, place, and activity that matter most under the Second Amendment, the Rule strikes at the heart of its protection. And that means that under *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Rule violates the United States Constitution.

## INTEREST OF AMICUS CURIAE

Attorney General Bill Schuette is the chief legal officer for the State of Michigan. His office is created by the Michigan Constitution, and he is elected by the people. Mich. Const. art. V, § 21. He is sworn to uphold the United States Constitution, including the Second Amendment, Mich. Const. art. XI, § 1, and to uphold the Michigan Constitution, including its protection of every Michigan resident's "right to keep and bear arms for the defense of himself and the state," Mich. Const. art. I, § 6; Mich. Const. art. XI, § 1. He is authorized by law to represent the people of Michigan and to defend the important constitutional interests at stake here. Mich. Comp. Laws § 14.28; *see also id.* § 14.101.

This case involves the conflict between a state administrative rule and the constitutional right of all Michigan foster parents to protect themselves and their family, and thus implicates the interests of the people of Michigan. The Attorney General understands that the Michigan Department of Health and Human Services has an interest in protecting the well-being of the children in its foster care system, and appreciates the Department's many ongoing and heroic efforts to do so. But the Rule at issue comes at the expense of the constitutional rights of foster parents, whom we have entrusted with the care of some of our most vulnerable children. The Attorney General files this amicus brief to advocate in favor of those community servants and our country's most fundamental law—its Constitution.

**ARGUMENT**

**I.    Properly read, the Department's Rule prohibits foster parents from carrying a firearm in their home and from storing a firearm in a readily accessible manner and is therefore unconstitutional under *Heller*'s most basic holding.**

Michigan Administrative Code Rule 400.9415 sets forth the conditions under which a foster parent may have a weapon in the home:

> (3) Firearms are subject to the following conditions:
>
> > (a) Stored in a locked metal or solid wood gun safe or
> >
> > (b) Trigger-locked and stored without ammunition in a locked area.
> >
> > (c) Ammunition shall be stored in a separate locked location.
> >
> > (d) A handgun shall be registered. Documentation of the registration of the handgun shall be available for review.

The Department and its supporting Amicus immediately go astray by misinterpreting the challenged Rule to allow foster parents to carry a gun on their person.  (R. 9, ID 198; R. 10-1, ID 416.)  That misinterpretation causes them to miss the relevant (and dispositive) constitutional inquiry.

In fact, the plain language of the Rule allows a foster parent who owns a gun to do *only* one of two things with it: (1) "store[ ]" it in a "locked metal or solid wood gun safe" or (2) "store[ ]" it "[t]rigger-locked" in a "locked area." *Id.*  Under either option, the firearm is inoperable for immediate use because the ammunition must be "stored in a separate locked location." *Id.*

There is no third option.  The Rule makes no provision for carrying a firearm on your person within the home, as the Department contends.  That interpretation

reads words into the Rule, something this Court cannot do when interpreting Michigan regulations. *See Byker v. Mannes*, 641 N.W.2d 210, 215 (Mich. 2002) ("It is a well-established rule of statutory construction that this Court will not read words into a statute."); *Detroit Base Coal. for Human Rights of Handicapped v. Dep't of Soc. Servs.*, 428 N.W.2d 335, 341 (Mich. 1988) (rules of statutory construction apply to administrative rules); *see also Heller*, 554 U.S. at 630 (rejecting D.C.'s invitation to read a self-defense exception into its ordinance because it was "precluded by the unequivocal text").

There is also no support for the Department's claim that ammunition can be stored in the *same* place as the firearm. (R. 9, ID 198.) The Rule states that "[a]mmunition shall be stored in a *separate locked location*." Mich. Admin. Code r. 400.9415(3)(c) (emphasis added). If it must be in a "separate" location, it cannot be in the "same" location.

This plain language has important constitutional consequences: it means the Rule is indistinguishable from the ordinance struck down in *Heller*. By requiring a foster parent to keep his firearms stored inoperably—at all times, since, again, there is no provision other than for storage—the Rule necessarily prohibits the foster parent from carrying a firearm inside his home. In *Heller*, the Supreme Court invalidated D.C.'s requirement for that precise reason: because it required a citizen to store his firearm in a manner that "render[ed] it inoperable" by requiring "any lawful firearm in the home be disassembled or bound by a trigger lock at all times." 554 U.S. at 628. Focusing on the text and history of the Second

Amendment, the Court dispensed with the rigmarole of choosing and applying a particular tier of scrutiny, instead holding, with notable brevity: the restriction "makes it impossible for citizens to use [firearms] for the core lawful purpose of self-defense and is hence unconstitutional." *Id*.

*Heller's* holding applies with equal—or even greater—force here. By requiring foster parents to keep their firearms stored inoperably at all times, the Rule makes it impossible for citizens—indeed, a class of citizens which the State has identified as being worthy of *extra* responsibility and trust—to exercise their individual right to keep and bear arms "for the core lawful purpose of self-defense." *Id*. "[H]ence" it is unconstitutional. *Id*. No further analysis is necessary to resolve this case.

## II. Even under the Department's reading, which would allow foster parents to carry firearms, the Rule fails to pass constitutional muster.

Even if this Court indulges the Department's extra-textual interpretation—that the Rule allows foster parents to carry firearms—the Rule still fails to pass constitutional muster.

### A. Because it infringes on the core right protected by the Second Amendment, the Rule is unconstitutional under any of the prevailing approaches to analyzing Second Amendment challenges.

"[T]he right of the people to keep and bear Arms[ ] shall not be infringed." These are the words of the Second Amendment, widely considered "the true palladium of liberty." *Heller*, 554 U.S. at 606 (quoting 1 Blackstone's Commentaries

300 (1803)).  The Second Amendment did not earn this accolade lightly.  Its principles have withstood the test of time, enduring monarchs and despots by "offer[ing] a strong moral check against the usurpation and arbitrary power of rulers."  *McDonald v. City of Chicago, Ill*, 561 U.S. 742, 770 (2010) (quoting 3 J. Story, Commentaries on the Constitution of the United States § 1890, p. 746 (1833)).  It is a history worth briefly reciting here lest we repeat it.

The right to keep and bear arms dates back to 17th Century England, when "the Stuart Kings Charles II and James II succeeded in using select militias loyal to them to suppress political dissidents, in part by disarming their opponents," most notably Protestants.  *Heller*, 554 U.S. at 592–93.  In response to that and other abuses, the English eventually "obtained an assurance . . . in the Declaration of Rights (which was codified as the English Bill of Rights), that Protestants would never be disarmed."  *Id*. at 593 (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441).

This provision in the Declaration of Rights is widely understood to be the predecessor to the Second Amendment of the U.S. Constitution.  *Id*.  Fearing a reprise of 17th Century abuses by the newly formed federal government, the Founders codified the Second Amendment as an indelible reminder that the right to keep and bear arms suitable for self-defense—which "the people" long enjoyed before the Constitution and our republic—"shall not be infringed."  U.S. Const. amend. II; *Heller*, 554 U.S. at 594–95.

Nearly 225 years later and the outer contours of the Second Amendment are still undefined, but this much is clear: the Second Amendment safeguards "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635; *see also People v. Yanna*, 824 N.W.2d 241, 244 (Mich. App. 2012) ("*Heller*'s formulation appears to be equivalent to the provision in Const. 1963, art. 1, § 6, which states, 'Every person has a right to keep and bear arms for the defense of himself and the state.' ").

In the wake of *Heller*, lower courts have taken several approaches to determining whether a challenged law is unconstitutional under the Second Amendment. *See generally*, David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis U.L.J. 193 (2017). The first step in each approach is the same: an initial historical inquiry into whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood. *Id*. at 229. If the burdened conduct falls outside that scope, the law does not implicate the Second Amendment and the analysis ends.

But if the challenged law burdens conduct that falls within the scope of the Second Amendment right, lower courts proceed to use one of three modes of analysis. A number of jurists, hewing closely to *Heller*'s textual-historical inquiry, stop at that first step: they "assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." *Heller v. D.C. (Heller II)*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting);

*see also Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 702 (6th Cir. 2016)

(Batchelder, J., concurring in most of the judgment) ("The Supreme Court has at

every turn rejected the use of interest balancing in adjudicating Second Amendment

cases."). Under this approach, if a law burdens conduct that falls within the Second

Amendment's historical scope, then the law is unconstitutional, regardless of the

state's interest in burdening the constitutionally protected activity or how closely its

restriction is tailored to that interest.

Other courts, however, add a balancing step after *Heller*'s historical

approach, also asking "(1) 'how close the law comes to the core of the Second

Amendment right,' and (2) 'the severity of the law's burden on the right.'" *Tyler*,

837 F.3d at 690 (plurality opinion, by Gibbons, J.) (quoting *United States v. Chovan*,

735 F.3d 1127, 1138 (9th Cir. 2013)). Under this approach, laws that substantially

burden the core protection of the Second Amendment are then analyzed under strict

scrutiny; all others are analyzed under intermediate scrutiny. *Heller II*, 670 F.3d at

1257 (majority opinion).

Fortunately, the Court need not resolve which analytical framework is

correct, because the Department's Rule is unconstitutional under any of these

approaches.

**B.     The Rule burdens the people, place, and activity historically protected by the Second Amendment.**

The first question, common to all three approaches, is whether the Rule, as interpreted by the Department, implicates the Second Amendment as it was historically understood.

It does.  The Rule burdens the Second Amendment in every way that matters.  It impacts the constituency that matters most (law-abiding citizens), in the place that matters most (the home), engaging in the conduct that matters most (keeping and bearing arms for self-defense).

**1.     The Rule burdens the core constituency of the Second Amendment—"law-abiding, responsible citizens."**

The Second Amendment protects the right of "the people."  U.S. Const. amend. II.  In *Heller*, the Supreme Court explained that the body known as "the people" consists of "law-abiding, responsible" "members of the political community." 554 U.S. at 635, 580.

The Department's Rule, which applies to licensed foster parents, burdens *only* "law-abiding, responsible citizens."  *Id.* at 635.  We know this because to even be eligible to foster a child, a person must pass an initial safety screening and criminal history background check.  (R. 9-8, ID 252–53, 257.)

But that tells only half the story.  Applicants must further demonstrate to the Department they are of good moral character.  (R. 9-8, ID 257.)  Those who make it through this rigorous screening process are those in whom the Department places great trust and confidence: it entrusts them with the care of children.  And

9

more than that, they are the select members of our communities who are willing and able to answer the call to service. A person does not resign his membership in "the people" by undertaking such an important civic duty.

But that is just what the Rule requires. The Department and its supporting Amicus suggest there is no constitutional infirmity because foster parents can either forego the benefit of becoming a licensed foster parent or voluntarily "agree to curtail their rights." (R. 9, ID 210; R. 10-1, ID 416.) This kind of argument has failed in many other contexts and, for similar reasons, fails here, too. Telling would-be foster parents that they must give up their fundamental right to defend themselves and their family in return for the benefit of becoming a licensed foster parent is like telling a college professor to give up his right to free speech in return for continued employment, *see Perry v. Sindermann,* 408 U.S. 593 (1972), or like telling a property owner to give up his Fifth Amendment right to just compensation in return for a land-use permit, *see Dolan v. City of Tigard*, 512 U.S. 374 (1994), or like telling a Seventh-day Adventist to give up her religious conviction against working on the Sabbath in return for unemployment benefits, *see Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136 (1987).

The point is, "the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mgt. Dist.*, 133 S. Ct. 2586, 2594 (2013) (quoting *Regan v. Taxation with Representation of Wash.,* 461 U.S. 540, 545 (1983)). That means the Department cannot force a person who is otherwise eligible and entitled to be a foster parent—indeed, one who has been

vetted and found to be law-abiding and of good moral character—to choose between being a licensed foster parent and exercising his fundamental right to keep and bear arms for self-defense. The Department itself recognizes the benefits of becoming licensed (*see* R. 9-8, ID 261–63), implicitly underscoring the constitutional infirmity.

In a related vein, the Department's Amicus insists the Rule does not burden the Second Amendment because foster parents tolerate other constitutional infringements, most notably on the right against unreasonable searches. (R. 10-1, ID 417.) This argument has three problems. First, the Fourth Amendment rights of foster parents are not being infringed, because routine administrative "searches" of their premises are not "unreasonable." *See, e.g.*, *Wildauer v. Frederick Cty.*, 993 F.2d 369, 372 (4th Cir. 1993). Second, even if foster parents were giving up a right, just because a person tolerates one constitutional invasion does not mean he must accept them all; for example, someone enlisting in the military accepts a number of restrictions on speech and on other liberties, but that does not mean the soldier has given up the right, for example, to be free from cruel and unusual punishment. So foster parents' willingness to limit their rights with respect to searches does not mean they are willing to tolerate restrictions that essentially obliterate their right to bear arms. Third, the analogy misses the mark because the Fourth Amendment's malleable, fact-specific "reasonableness" standard is out of place in a Second Amendment ecosystem that eschews a "freestanding 'interest-balancing' approach" in favor of a historical inquiry into what the right meant to those who ratified it.

*Heller*, 554 U.S. at 634–35; *cf. Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652–53 (1995) ("[W]here there was no clear practice . . . at the time the [Fourth Amendment] was enacted, whether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." (quotation marks and footnote omitted)). Thus, a ruling striking down Rule 400.9415(3) casts no doubt on other restrictions that the Department may impose on licensed foster parents.

In sum, the Rule burdens the Second Amendment's core constituency: law-abiding citizens whom the Department has already determined it can trust with our communities' most vulnerable children.

### 2. The Rule burdens the place where the Second Amendment right "is most acute"—the home.

Not only does the Rule burden law-abiding citizens, but it affects those citizens in the place that matters most: the home.

The Second Amendment protects the right of the people to keep and bear arms for self-defense, "*most notably . . . within the home.*" *McDonald*, 561 U.S. at 780 (plurality opinion) (emphasis added). The home is the epicenter of the Second Amendment. Whatever else it may protect, the Second Amendment safeguards "the right of law-abiding, responsible citizens to use arms in defense of *hearth and home.*" *Heller*, 554 U.S. at 635.

A person's home is many things. It has been called "the bulwark of our American civilization," *McGowan v. Maryland*, 366 U.S. 420, 507 (1961), "the last citadel of the tired, the weary, and the sick," *Gregory v. Chicago,* 394 U.S. 111, 125 (1969) (Black, J., concurring), "the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits," *Carey v. Brown*, 447 U.S. 455, 471 (1980), and, most importantly, the place "where the need for defense of self, family, and property is most acute," *Heller*, 554 U.S. at 628.

This widespread recognition of the importance of the home does not include characterizing it as a "sensitive" place, as the Department contends. (R. 9, ID 203–04.) The "sensitive places" that *Heller* indicated were traditionally subject to firearm regulations are "schools and government buildings." *Id.* at 626. But the Department and amicus provide *no* historical support for the assertion that a foster home falls into either of those categories. Nor, for that matter, do they point to any historical pedigree for restrictions on how to store one's gun inside their home. The most they can point to is gunpowder storage regulations, *see* R. 9, ID 203, which *Heller* itself distinguished as mere "fire-safety laws," *Heller*, 554 U.S. at 632.

The Department also relies on its own sixteen-year-old Rule as evidence of a "longstanding prohibition" against underage persons possessing firearms. (R. 9, ID 204.) But whatever else *Heller* meant by "longstanding," it did not mean regulations first promulgated in the 21st Century. *See Tyler*, 837 F.3d at 687 (holding that prohibition on gun possession by the mentally ill is not "longstanding" under *Heller* because "legal limits on the possession of firearms by

the mentally ill . . . are of 20th Century vintage" (ellipsis in original) (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010)).

In the absence of any historical precedent for its restriction, the Department asks this Court to treat the foster home as a governmental building because it has an interest in regulating what goes on there. (R. 9, ID 204.) This argument confuses the scope of the right—i.e., where it applies—with the State's justification for burdening it. The scope of the right is an historical inquiry, not a policy choice. *See Tyler*, 837 F.3d at 688 (plurality) ("[The] first step asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood." (quotation marks omitted)). Only after first determining the scope of the right, does the state's policy reason for regulating conduct in a particular place factor into the analysis. *Id.* at 693.

But even as a matter of policy, the advantage of a foster home is that it is *not* a governmental setting. *See* Lois A. Weithorn, *Envisioning Second-Order Change in America's Responses to Troubled and Troublesome Youth*, 33 Hofstra L. Rev. 1305, 1452 (2005) ("There is no question that many children are far better off in foster homes than in large institutions."). Indeed, it provides the benefits of a residential environment, including the sense of protection that comes from foster parents living in a stable family setting. *See, e.g.*, State of Mich. Dep't of Health and Human Servs., DHS Pub-435, The Foster Child (Nov. 2009). That residential setting, however, means that the Department (or any public officer) cannot be there to provide protection 24/7—which is precisely why we have to trust the foster parent

to perform that vital role.  So, unlike schools and public buildings, the foster home is a place "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628 (describing "the home").  It will be the foster parent (not the Department's caseworker) who will be there to protect the foster child from a midnight intruder.  And it may well be a readily accessible firearm that protects them both.

A foster home is first and foremost a home.  Accordingly, the foster parent (whom the State trusts to exercise good judgment in taking care of foster children) should also be trusted to exercise his or her good judgment in storing firearms so the firearms are both secure *and* readily accessible when needed, so the parent will be able to protect the home.  The Constitution requires no less.

In short, the Rule burdens the constituency that matters most (law-abiding citizens) in the place the matters most (the home) for purposes of the Second Amendment.

3. **The Rule prevents foster parents from exercising their protected right to have a firearm "operable for the purpose of immediate self-defense."**

Finally, under the Department's reading of the Rule (which allows foster parents to carry firearms but requires that they store the firearm away inoperably when it is not on their person), the Rule prevents foster parents (who, again, are both law-abiding citizens *and* of good moral character) from fully engaging in the core activity protected by the Second Amendment:  keeping and bearing arms for self-defense.

The Second Amendment protects the right of the people to "keep and bear Arms," U.S. Const. amend. II, for self-defense, *Heller*, 554 U.S. at 630. Michigan's Constitution provides the same protection. Mich. Const. art. I, § 6 ("Every person has a right to keep and bear arms for the defense of himself and the state."); s*ee also People v. Deroche*, 829 N.W.2d 891, 894 (Mich. App. 2013) (analyzing a challenge under Michigan's Second Amendment analogue "within the parameters" of *Heller* and holding that the right guaranteed "the individual right to possess and carry weapons in case of confrontation" (quoting *Heller*, 554 U.S. at 592)). But the Department's reading of the Rule severely limits foster parents' right to self-defense. It presents a Hobson's choice: foster parents may carry the firearm on your person morning, noon, and night *or* they may store it away inoperably while it is not on their person.

The first option is impractical. Surely a foster parent cannot be expected to carry his firearm while holding a toddler, while taking a shower, or while sleeping. Indeed, carrying a firearm on one's person in certain situations may be irresponsible, if not dangerous. As two Second Amendment scholars recently observed, "Such a requirement would cause residents to carry firearms far more frequently and in impractical situations when they otherwise would not carry a firearm, perhaps resulting in *more* firearm accidents." Kopel & Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis U.L.J. at 299 (emphasis added).

That leaves the second option:  storing the firearm inoperably whenever it is not on your person.  Indeed, it appears this is what the Department has in mind when it says, "[T]he rule merely requires that, when not in use, firearms must be safely stored." (R. 9, ID 198.)  But the Second Amendment's core right to keep and bear arms for self-defense necessarily carries with it the predicate right to keep those arms in a way that they can be used to further their constitutional purpose: to be available and capable of being used for immediate self-defense.  *See Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) ("Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise.").  Just as "[t]he right to keep and bear arms . . . implies a corresponding right to obtain the bullets necessary to use them," *id.* (quotation marks omitted), so too does it imply the right to "keep" them in a way that they can be used for self-defense.

As a practical matter, when a firearm is kept in a home for self-defense, it is always "in use."  Criminals never take a day off, and they never call ahead.  To serve its self-defense purpose, a gun must be readily accessible *whenever* its owner believes he might possibly need it.  Indeed, there are many circumstances in which an owner may conclude it is not safe to have his gun on his person, but still feel the necessity to have it available for immediate self-defense.  Sleeping is just one example.

Anyone with a basic understanding of firearms knows that an inaccessible, inoperable firearm is no firearm at all.  And that is exactly why *Heller* declared that

the Second Amendment protects the right, not to a theoretically operable firearm, but to an "operable [firearm] for the purpose of immediate self-defense." 554 U.S. at 635; *see also id.* at 629 (observing that citizens prefer handguns for home defense because they can be kept "a location that is readily accessible in an emergency"); *People v. Wilder*, 861 N.W.2d 645, 649 (Mich. App. 2014) (holding that Michigan's analogue "guarantee[s] an individual "a right to keep and bear arms for self-defense").

Here, because even under the Departments reading of the Rule it *requires* foster parents to *always* keep their firearms stored away *inoperably* while not on their person, the Rule necessarily prohibits them from keeping arms "for the purpose of immediate self-defense." *Heller,* 554 U.S. at 635. And that requirement essentially leaves foster parents—law-abiding citizens whom the State especially entrusts with the care of vulnerable children—with nothing more than the illusion of protection that the Second Amendment and an immediately accessible firearm provides.

* * *

In sum, the Rule burdens the three major components of the core Second Amendment right as it was historically understood. It prevents (1) law-abiding, responsible citizens (2) in their home (3) from keeping and bearing arms for the purpose of self-defense.

Having established that the Rule restricts core Second Amendment-protected interests, the next step is to decide between the three modes of analysis commonly

applied by lower courts.  The first approach limits itself to examining the scope of the Second Amendment right based on text, history, and tradition.  Under the second and third approaches, this court first must assess how much the challenged law burdens the Second Amendment and, depending on the severity of the burden, apply either strict scrutiny (for substantial burdens) or intermediate scrutiny (for not-so-substantial burdens).  Again, no matter how this Court analyzes the Rule, it is unconstitutional.

### C.  Under the history-focused approach, the Department's Rule infringes core conduct protected by the Second Amendment and is therefore per se unconstitutional.

The task for a court following the first approach is a simple one: if the conduct burdened by the law falls within the scope of the Second Amendment, as historically understood, the law is unconstitutional, regardless of how strong the government's interest is or how finely tailored its restriction.  *See generally*, *Heller II*, 670 F.3d at 1269–96 (Kavanaugh, J., dissenting).

This approach finds full support from *Heller*, which placed primary emphasis on the text, history, and tradition to the specific exclusion of ad-hoc balancing inquiries.  *See Tyler*, 837 F.3d at 702–03 (Batchelder, J.) ("The Supreme Court has at every turn rejected the use of interest balancing in adjudicating Second Amendment cases.").  In *Heller*, the Court exhaustively surveyed the text, historical justifications, and post-enactment tradition of the Second Amendment to ascertain the scope of its protection.  554 U.S. at 579–619.  Whatever results this inquiry yielded, the Court made clear, was the end of the constitutional inquiry: "The very

enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634. In response to the dissent's proposed intermediate scrutiny-based approach, the Court added, "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach." *Id.*

This approach also has the added virtue of simplicity. As Judge Batchelder explained, "A law either infringes a constitutional right, or not; there is no room for the judiciary to invent tolerable degrees of encroachment." *Tyler*, 837 F.3d at 707 (Batchelder, J.) (quoting *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2329–30 (2016) (Thomas, J., dissenting)).

Under this straightforward approach, the Rule's fate is clear. Because it burdens all three components of the core protection of the Second Amendment—law abiding citizens, in their home, keeping firearms for immediate self-defense—the Rule infringes the right to keep and bear arms as it was historically understood. In this situation, there is no need for additional judicial inquiry into "whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. The Second Amendment provides that answer: "[it] shall not be infringed." U.S. Const. amend. II.

### D. Under the interest-balancing approach of strict scrutiny, the Rule also fails.

The outcome is the same if the Court engages in an interest-balancing approach and applies strict scrutiny: the Rule is unconstitutional.

In deciding whether to apply strict or intermediate scrutiny, courts engaging in interest balancing look to "(1) 'how close the law comes to the core of the Second Amendment right,' and (2) 'the severity of the law's burden on the right.' " *Tyler*, 837 F.3d at 690 (Gibbons, J.) (quoting *Chovan*, 735 F.3d at 1138). The Rule here strikes at the heart of the Second Amendment, impacting the constituency that matters most (law-abiding citizens), the place that matters most (the home), and the conduct that matters most (keeping and bearing arms for self-defense). In addition, it significantly burdens that right, leaving foster parents with nothing more than the theoretical right to keep and bear arms. Under an interest-balancing approach, some courts would apply strict scrutiny. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 205 (5th Cir. 2012) ("A law that burdens the core of the Second Amendment guarantee—for example, 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home,' *Heller,* 554 U.S. at 635—would trigger strict scrutiny.").

Notably, the Department does not argue that the Rule survives strict scrutiny, which is fatal to its motion under a strict-scrutiny analysis. *See Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2419 (2013) ("[I]t is the government that bears the burden" of proof under strict scrutiny.). In any event, the Rule does not even survive intermediate-scrutiny analysis, the standard the Department asks this Court to apply.

**E.     The Department's Rule fails even under intermediate scrutiny.**

Even assuming intermediate scrutiny applied, the Department has failed to establish as a matter of law that the Rule's substantial burden on the exercise of core Second Amendment rights is sufficiently tailored to achieve its stated purpose.

Under intermediate scrutiny, the Department bears the burden of establishing (1) that its stated objective is "significant, substantial, or important" and (2) that the challenged regulation is sufficiently tailored to the asserted objective.  *Tyler*, 837 F.3d at 693 (plurality).

**1.     The Department's undisputed interest in protecting foster children cannot override the constitutional judgment, embodied in the Second Amendment, that responsible citizens can be trusted with firearms.**

The Department contends that it has an important interest in protecting the health and safety of foster children (R. 9, ID 207), and the Attorney General agrees. Nevertheless, the Rule produces constitutionally unacceptable consequences, both in the present case and in the future.  Just as state and local legislators who believe the children in their communities should be healthy and safe cannot enact unconstitutional storage requirements for all gun owners with children, neither can the Department.

Safety and security are important state interests, but the Department's judgment about what promotes safety and security cannot override the judgment that we the people enacted as the law of the land in the Second Amendment—the judgment that safety and security are promoted, not harmed, by preserving the right of law-abiding citizens to bear arms for the defense of their own homes.

*Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.").

### 2. The Department's Rule is not sufficiently tailored to its stated objective of protecting foster children from firearm fatalities.

To survive intermediate scrutiny, the Department must also demonstrate that the Rule is sufficiently tailored to its stated interested in protecting the health and safety of foster children. The means adopted need not be "the least restrictive" possible, but they must be "narrowly tailored to achieve the desired objective." *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1457 (2014) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480 (1989) (applying intermediate scrutiny)). In other words, the Department must show that the burden imposed by the Rule is "in proportion to the interest served." *Id.* at 1456–57 (quoting *Fox,* 492 U.S. at 480). In so doing, the Department cannot rely on anything less than "*reasonable* inferences based on *substantial* evidence." *New York State Rifle & Pistol Ass'n, Inc v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997)). And it cannot "get away with shoddy data or reasoning." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002)).

The Department argues that its Rule is a reasonable fit because it is limited to foster parents. (R. 9, ID 207.) This argument is off-target for two reasons. For one, this kind of divide-and-conquer approach would justify just about any less-than-universal restriction on fundamental liberties. The D.C. handgun ban at issue

in *Heller* was not constitutionally sound simply because it was limited to the city limits.  To the contrary, for those within its geographic scope it was a severe infringement on their Second Amendment rights.  *Heller*, 554 U.S. at 630.

So too here.  For the foster parents affected by the Rule, the burden is significant, amounting to a blanket prohibition on keeping a firearm readily accessible for immediate self-defense.  Worse, the Rule applies at the time when, in the exercise of the judgment the State entrusts them with, foster parents may need the firearm the most: when there are vulnerable children living in their home who are in need of their protection.

Second, studying the Rule from the Department's perspective, it applies indiscriminately to *all* licensed foster parents.  In that sense, the Rule is the broadest restriction the Department could possibly have adopted.  It did not, for instance, tailor the Rule to only those foster parents the Department decides needs additional oversight when it comes to firearm safety.  (Of course, if the Department were to think that particular foster parents were not responsible enough to keep firearms safely in their home, then one might wonder why the Department would continue to think those individuals would be responsible enough to care for foster children in the first place.)  To be clear, the Department need not adopt the *least* restrictive means, but it must still make a modicum of effort to tailor its policy to the specific evil being remedied.

And it is possible to develop a closer fit: at least four other states allow gun owners either to keep firearms readily accessible or to keep them where a

reasonable person would believe a minor could not access them. *See* Fla. Stat. Ann. § 790.174; Haw. Rev. Stat. Ann. § 134-10.5; 11 R.I. Gen. Laws Ann. § 11-47-60.1; Tex. Penal Code Ann. § 46.13. Notably, none of these states impose stricter burdens on foster parents. *See* Fla. Admin. Code Ann. R. 65C-13.030(3)(j)(6); Haw. Code R. 17-891.1-32(6); R.I. Code R. 14-3-174:1-1.7; 40 Tex. Admin. Code § 749.2961. In contrast to these laws that thoughtfully balance safety with a necessary respect for the fundamental right to keep and bear arms, the Department's Rule requires a foster parent to store his firearm inoperably any time it is not on his person. Thus, unlike the Rule, these laws do not force a gun owner to keep his guns in a way that prevents him from using them for immediate self-defense.

It is worth noting in closing that the Rule's ill-tailored restrictions are in pursuit of a safety concern that the Department has yet to empirically substantiate in this case. *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995) (to survive intermediate scrutiny, the government must establish that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree"). The Department's Amicus tries to fill this empirical void by citing studies and surveys that purport to show that between 7.7% and 28% of foster children are abused while in state custody. (*See* R. 10-1, ID 423.) Neither survey attempted to make any connection to injuries inflicted by negligently stored firearms. Instead, both documented "a pattern of physical, sexual and emotional abuses." Lifting the Veil – A Critical Look At The Foster Care System: How Widespread a Problem?, http://www.liftingtheveil.org/foster04.htm (last accessed Nov. 15, 2017); Michael B.

Mushlin, *Unsafe Havens: The Case for Constitutional Protection of Foster Children from Abuse and Neglect*, 23 Harv. C.R.-C.L. L. Rev. 199, 205 (1988) (documenting the same). Thus, Amicus's attempt to shore up the Department's defense of the Rule fails to make any connection between the abuse foster children suffer and the risk posed by firearms in the home.

In truth, whether "safe" storage laws like the one at issue here reduce gun deaths is up for debate. According to two scholars who have studied the issue, "Safe-storage laws have no impact on accidental gun deaths or total suicide rates." John R. Lott, Jr. & John E. Whitley, *Self-Storage Gun Laws: Accidental Deaths, Suicides, and Crime*, 44 J.L. & Econ. 659, 685 (2001). "The impact of safe-storage laws," Lott and Whitley explained, "is consistent with existing research indicating that the guns that are most likely to be used in an accidental shooting are owned by the least law-abiding citizens and thus are least likely to be locked up after the passage of the law." *Id.* at 686. These scholars add that safe-storage laws have the perverse effect of raising crime rates because households with low accidental death risks are now the ones most likely to obey the law. *Id.*; *see also id.* ("The only consistent impact of safe-storage laws is to raise rape, robbery, and burglary rates, and the effects are very large."); David B. Kopel et al., *Smart Guns/Foolish Legislators*, Finding the Right Public Safety Laws, and Avoiding the Wrong Ones, 34 Conn. L. Rev. 157, 172 (2001)("[S]o far as we know, no one has pointed to flaws in [Lott and Whitley's] study.").

Lott and Whitley's finding that those who are most likely to obey safe-storage laws are the least likely to need them is especially pertinent here. The very fact that a person is eligible to be a foster parent means the Department has determined they have the requisite moral fitness and good judgment to fulfill one of the Department's most important obligations: carrying for foster children. It is illogical (and in Lott and Whitley's view, counterproductive), to then dictate how foster parents should exercise their Second Amendment right on the assumption that they cannot be trusted to exercise good judgment. Simply put, foster parents are not the demographic of individuals who are likely to negligently store their firearms. At the very least, it is incumbent on the Department to present "substantial evidence" that negligent storage of firearms by foster parents is an actual problem. *See NYSRPA*, 804 F.3d at 264.

Moreover, the Rule neglects the reality that responsible gun ownership deters criminals. *See* Lott & Whitley, *Self-Storage Gun Laws*, 44 J.L. & Econ. at 663 n.18. The Department's Rule subverts that deterrent effect by requiring foster parents to keep their firearms locked away inoperably whenever the firearm is not on their person. Foster parents and foster children—the very group the Rule purports to protect—are less safe as a result. *See id.* at 660 ("There is evidence that restrictions on people's ability to defend themselves encourages criminals to attack."). According to Lott and Whitley's findings, the Department's Rule is more likely to create the perverse result of increasing the crime rate at foster homes while doing

little to reduce accidental discharge deaths by family members. That is hardly a reasonable fit.

In sum, in its defense of the Rule, the Department falls far short of what is required to "affirmatively establish the reasonable fit [the Supreme Court] require[s]." *Fox*, 492 U.S. at 480. Absent sufficient empirical evidence that restrictive storage laws will advance its interest in foster child safety, the Rule cannot survive even intermediate scrutiny, especially considering the evidence suggesting that the Rule makes foster parents and foster children *less* safe. As the laws of four other states demonstrate, the Rule could have adopted more measured approaches to this issue, thus avoiding the disproportionate burden it places on protected Second Amendment rights. The Rule therefore fails under intermediate scrutiny.

## CONCLUSION AND RELIEF REQUESTED

The Department made what it believed was a reasonable policy choice about how best to keep and bear firearms. But the Second Amendment takes that policy choice out of the hands of government officials and instead entrusts it to "the people." *Heller*, 554 U.S. at 634. The people to whom State entrusts the care of its most vulnerable children deserve no less constitutional protection than the average, law-abiding citizen.

Respectfully submitted,

Bill Schuette
Attorney General

/s/ Aaron D. Lindstrom
Solicitor General
P.O. Box 30212, Lansing, MI 48909
517-241-8403
LindstromA@michigan.gov
[P72916]

Ann M. Sherman [P67762]
Assistant Solicitor General

Dated: November 29, 2017

David A. Porter [P76785]
Assistant Attorney General