## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| WILLIAM JOHNSON, JILL JOHNSON, BRIAN MASON, NAOMI MASON, and SECOND AMENDMENT FOUNDATION, INC., | ) ) ) ) ) |
| Plaintiffs, | ) ) ) No. 2:17-CV-124-PLM-TPG |
| v. | ) ) |
| NICK LYON, in his official capacity as Director of the Michigan Department of Health and Human Services, | ) ) ) ) ) |
| Defendant. | ) |

### PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

NOW COME the Plaintiffs, WILLIAM JOHNSON, JILL JOHNSON, BRIAN MASON, NAOMI MASON, and SECOND AMENDMENT FOUNDATION, INC., by and through LAW FIRM OF DAVID G. SIGALE, P.C., their attorney, and submit their Response to the Defendants' F.R.Civ.P. 12(b)(1),(6) and 56 Motion to Dismiss.


Dated: November 30, 2017          Respectfully submitted,

By:      /s/ David G. Sigale
Attorney for Plaintiffs

### ORAL ARGUMENT REQUESTED

David G. Sigale (Atty. ID# 6238103 (IL))
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
Tel: 630.452.4547
Fax: 630.596.4445
dsigale@sigalelaw.com

i

# TABLE OF CONTENTS

Table of Authorities ..................................................................... iii

Concise Statement of Issue Presented .............................................. ix

Controlling or Most Appropriate Authority ...................................... x

Introduction ............................................................................... 1

Statement of Facts ...................................................................... 2

Argument .................................................................................. 7

F.R.Civ.P. 12(b)(6) Standard ........................................................ 7

F.R.Civ.P. 56(c) Standard ............................................................ 8

I.      THE PLAINTIFFS HAVE STANDING TO BEING THIS SUIT ................... 9

II.     THIS MATTER IS RIPE .................................................... 12

III.    THE *BURFORD* ABSTENTION DOCTRINE DOES NOT APPLY ............ 13

IV.     THE PLAINTIFFS' SECOND AMENDMENT RIGHTS CANNOT BE
        INFRINGED JUST BECAUSE THEY FOSTER OR ADOPT CHILDREN
        THROUGH THE STATE .................................................... 16

V.      IT IS IRRELEVANT THAT LEGISLATIVE BILLS ARE PENDING ......... 26

VI.     THE DEFENDANT'S RULE VIOLATES THE FOURTEENTH
        AMENDMENT'S EQUAL PROTECTION AND DUE PROCESS
        CLAUSES ................................................................. 27

Conclusion ............................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*AmSouth Bank v. Dale,*
    386 F.3d 763 (6th Cir. 2004) ............................................................ 15

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................... 9

*Babbitt v. United Farm Workers Union,*
    442 U.S. 289 (1979) ........................................................ 10

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................... 8

*Bird v. Parsons,*
    289 F.3d 865 (6th Cir. 2002) ........................................... 7

*Bras v. California Pub. Utilities Comm'n,*
    59 F.3d 869 (9th Cir. 1995) ............................................ 9

*Burford v. Sun Oil Co.,*
    319 U.S. 315 (1943) ................................................. 13, 14, 15, 16

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010) .......................................................... 12

*Colorado River Water Conservation Dist. v. United States,*
    424 U.S. 800 (1976) ..................................................... 13, 14

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................................. *passim*

*ETW Corp. v. Jireh Publ'g, Inc.,*
    332 F.3d 915 (6th Cir. 2003) ........................................... 9

*Elwell v. Byers,*
    699 F.3d 1208 (10th Cir. 2012) ................................... 30, 31

*Enhance, Inc. v. Snyder,*
    16 CV 11854 (E.D.Mich.) ................................................ 12

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ..................................................... 9, 11, 22

*Faparusi v. Case W. Reserve Univ.*,
    2017 U.S. App. LEXIS 19593 (6th Cir. 2017) ........................................... 8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167, 120 S. Ct. 693 (2000) ....................................................... 10

*GTE North, Inc. v. Strand*,
    209 F.3d 909 (6th Cir. 2000) ................................................................ 16

*Habich v. City of Dearborn*,
    331 F.3d 524, 533 (6th Cir. 2003) ........................................................ 16

*Jackson v. City and County of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) ................................................................ 19

*Jones v. Ada S. McKinley Community Services*,
    1989 U.S. Dist. LEXIS 14312 (N.D.Ill. 1989) ........................................ 33

*Lindstrom v. A-C Prod. Liab. Trust*,
    424 F.3d 488 (6th Cir. 2005) .................................................................. 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................... 8

*McDonald v. City of Chicago*,
    130 S.Ct. 3010 (2010) ................................................................. *passim*

*Meyer v. Nebraska*,
    262 U.S. 390 (1923)............................................................................. 27

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) .................................................... 11, 19, 33

*NRA of Am. v. Magaw*,
    132 F.3d 272 (6th Cir. 1997) ................................................................. 9

*New Orleans Pub. Serv. Inc. v. Council of New Orleans*,
    491 U.S. 350 (1989) ..................................................................... 14, 15

*Palko v. Connecticut*,
    302 U.S. 319 (1937) ........................................................................... 27

iv

*Paris Adult Theatre I v. Slaton,*
413 U.S. 49 (U.S. 1973) ......................................... 27

*Peoples Rights Org. v. City of Columbus,*
152 F.3d 522 (6th Cir. 1998) ............................... 10

*Pic-A- State Pa., Inc. v. Reno,*
76 F.3d 1294 (3d Cir. 1996) ................................. 9

*Pierce v. Soc'y of Sisters,*
268 U.S. 510 (1925) ...................................... 27, 28

*Plyler v. Doe,*
457 U.S. 202 (1982) ........................................... 32

*Prince v. Massachusetts,*
321 U.S. 158 (1944) .......................................... 28

*Procopio v. Johnson,*
994 F.2d 325 (7th Cir. 1993) .............................. 32

*Pursley v. Lake,*
5:16-CV-14 (W.D.OK) ....................................... 11

*Quackenbush v. Allstate Ins. Co.,*
517 U.S. 706 (1996) ........................................... 15

*Reno v. Flores,*
507 U.S. 292, 113 S. Ct. 1439 (1993) .................... 29

*Roe v. Wade,*
410 U.S. 113 (1973) .......................................... 27

*Rouse v. DaimlerChrysler Corp. UAW Non-Contributory Plan,*
300 F.3d 711 (6th Cir. 2002) ........................... 13, 14

*Sierra Club v. United States EPA,*
793 F.3d 656 (6th Cir. 2015) .............................. 10

*Smith v. Organization of Foster Families for Equality & Reform,*
431 U.S. 816, 97 S. Ct. 2094 (1977) ..................... 30

*Spielman v. Hildebrand,*
873 F.2d 1377 (10th Cir. 1989) ........................... 31

*Shults v. Sheldon,*
    2:16-CV-2214 (C.D.Ill.) ............................................................ 11

*State v. Reid,*
    1 Ala. 612 (1840) ..................................................................... 17

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ..................................................................... 9

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................... 9, 10

*Tenn. Republican Party (16-3360) v. SEC,*
    863 F.3d 507 (6th Cir. 2017) .................................................... 10

*Troxel v. Granville,*
    530 U.S. 57 (2000) ............................................................... 28, 29

*Turner v. Snyder,*
    1:12-cv-1095 (W.D.Mich.) ........................................................ 27

*United States v. Brown,*
    327 Fed.Appx. 526 (6th Cir. 2006) ........................................... 12

*United States v. Virginia,*
    518 U.S. 515 (1996) .................................................................. 32

*Veasey v. Wilkins,*
    2015 U.S. Dist. LEXIS 53894 (E.D.NC 2015) ...................... 11, 12

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) .................................................................. 11

*Washington v. Glucksberg,*
    521 U.S. 702, 117 S. Ct. 2258 (1997) ....................................... 29

*Wrenn v. District of Columbia,*
    864 F.3d 650 (D.C. Cir. 2017) .................................................. 11

## Constitutional Provisions

U.S. Const. Amend. II ............................................................ *passim*

U.S. Const. Amend. XIV .......................................................... *passim*

## Statutes, Rules and Ordinances

28 U.S.C. § 2201(a) ......................................................................... 9

Fed. R. Civ. P. 12(b)(6) ................................................................. 7

Fed. R. Civ. P. 56(c) ...................................................................... 8

MCLS § 722.112(4)(e) .................................................................. 33

MCLS § 722.121(2) ...................................................................... 30

MDHHS R. 400.9415 .......................................................... *passim*

## Other Authorities

U.S. Bureau of Justice Statistics. 2016. *Criminal Victimization, 2014.*
    Revised September 29, 2015 ................................................. 24

*First Reports Evaluating the Effectiveness of Strategies for Preventing
    Violence: Early Childhood Home Visitation and Firearms Laws*, 52
    MORBIDITY & MORTALITY WEEKLY REP. 15, 17-18
    (Oct. 3, 2003) ...................................................................... 21

Robert Hahn *et al.*, *Firearms Laws and the Reduction of Violence:
    A Systematic Review*, 28 AM. J. PREV. MED. 40, 40, 49, 56 (2005) ........... 21

Gary Kleck, *Crime Control Through the Private Use of Armed Force*, Social
    Problems 35(l):1-21 (1988) .................................................. 25

Gary Kleck, *The Frequency of Defensive Gun Use*, Chapter 6 in Armed,
    edited by Gary Kleck and Don B. Kates. NY: Prometheus Books.,
    pp. 214-229 (2001) .............................................................. 23

Gary Kleck, *Keeping, Carrying, and Shooting Guns for Self Protection*, DON B.
    KATES, JR. & GARY KLECK, THE GREAT AMERICAN GUN
    DEBATE: ESSAYS ON FIREARMS & VIOLENCE 199 (1997) ................. 22

Gary Kleck and Miriam DeLone, *Victim Resistance and Offender Weapon
    Effects In Robbery*, Journal of Quantitative Criminology
    9(1):55-82 (1993) ................................................................ 25

Gary Kleck and Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, J. of Criminal Law and Criminology, v.86, n.1, pp.150-187 (1995) ............................................... 23

Gary Kleck and Susan Sayles, *Rape and Resistance*, Social Problems 37(2):149-162 (1990) ............................................................... 25

Joyce Lee Malcolm, GUNS AND VIOLENCE: THE ENGLISH EXPERIENCE 239 & n.71 (2002) ............................................................... 21

Jongyeon Tark and Gary Kleck. *Resisting Crime: The Effects of Victim Action on the Outcomes of Crimes.* Criminology, 42(4):861-909 (2004) ................. 25

St. George Tucker, *View of the Constitution of the United States,* 1 BLACKSTONE'S COMMENTARIES, ed. app. at 300 (1803) .................. 17

Charles F. Wellford *et al.*, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 118-19 (eds., 2005) ............................................................... 21

<u>**CONCISE STATEMENT OF ISSUE PRESENTED**</u>

Does the Defendant's Foster Care Rule 400.9415, which prohibits Plaintiffs and other similarly-situated persons who participate in Michigan's foster care system from bearing arms for lawful purposes including self-defense and defense of others, unconstitutionally infringe on the Plaintiffs' Second Amendment rights, as well as the Plaintiffs' Fourteenth Amendment rights to equal protection of the law and substantive due process?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*District of Columbia v. Heller*, 554 U.S. 570 (2008).

*McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010).

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011).

<u>PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS</u>

<u>INTRODUCTION</u>

The Defendant instituted a Rule that forced the Johnsons and Masons, and every person who fosters children through the State, or considers fostering children through the State, to choose between fundamental Second Amendment rights, and the ability to foster children. Besides being terrible policy, it is unconstitutional.

The Defendant orders those fostering through MDHHS to comply with R. 400.9415. This Rule denies Plaintiffs the ability to defend themselves and their families, both in a vacuum and as compared to other types of parents in the State.

In compelling the choice between fostering and the ability of armed self-defense, the Defendant is treating persons who foster (whether or not they also have natural or adopted children) differently from those who have only natural or adopted children. This discrimination, which serves no purpose, violates the Plaintiffs' right to substantive due process and equal protection under the law pursuant to the Fourteenth Amendment, as well as those similarly-situated to Plaintiffs, such as members of the Plaintiff Second Amendment Foundation.

The policy also denies Plaintiffs their fundamental right to keep and bear arms under the Second Amendment to the United States Constitution. It is inequitable and improper that people trying to provide a better environment for children in need should have to make the decision required by the Defendant's Rule. Every day these unconstitutional policies are in force, they irreparably harm not

only the Plaintiffs but potentially their families as well, including children foster and natural.

Besides being unconstitutional under any form of heightened scrutiny, the Defendant has no valid interest in denying the fundamental rights of handgun possession and self-defense to law-abiding Michigan residents whose only offense is wanting to help children.

Therefore, under the Second Amendment to the United States Constitution, *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 130 S.Ct. 3010 (2010), Plaintiffs have stated a valid claim, and Defendant's Motion to Dismiss should be denied, whether or not it is considered under F.R.Civ.P. 12(b)(6) or 56.

## STATEMENT OF FACTS

- Plaintiff William Johnson is (now 55) years old, and resides with his family in Ontonagon, Michigan. Johnson is retired from the United States Marine Corps following disability, and also worked as a truck driver. He has lived in Ontonagon for nine years, and lived in the Grand Rapids area prior to that. William also possesses a Michigan Concealed Pistol License. In sum, he has many solid connections to the State of Michigan and the Ontonagon area, including his wife and his grandson who still reside in the area (Complaint at ¶ 9; Declaration of William and Jill Johnson, attached hereto).

- Plaintiff Jill Johnson resides with her family in Ontonagon, Michigan. She owns a tackle shop in Ontonagon, and likewise has many connections to Ontonagon and the State of Michigan (Complaint at ¶ 10).

- The Johnsons were asked by the State of Michigan to be foster parents to their grandchild. When Johnson and Jill and Mason went to pick up Johnson's grandson at the MDHHS, Johnson was searched. Even though Johnson was not carrying a firearm, the MDHHS officials still demanded to see Johnson's Concealed Pistol License. The caseworkers stated that Mr. Johnson, a 100% disabled veteran, was going to have to give them the serial numbers for all of his guns, including shotguns and rifles. When Johnson questioned the caseworkers about this, they told him: "if you want to care for your grandson you will have to give up some of your constitutional rights." They then told the Johnsons that "there would not be a power struggle, that they would just take his grandson and place him in a foster home." The MDHHS later said they had "big concerns" over Johnson exercising his Second Amendment rights and carrying a firearm. There is nothing in Johnson's history that would warrant such concerns (Complaint at ¶ 11).

- While this was ongoing, the Johnsons agreed to become licensed by the State as foster parents. Their grandson was placed with them in a foster capacity while their licensing was pending (Declaration at ¶ 3).

- Also, while the Johnson's foster care license application was pending, they agreed to foster other children who needed placement, not just their grandson (Declaration at ¶ 4).

- Notwithstanding their treatment by the MDHHS caseworkers regarding William's firearms, and their grave concern about losing their Second Amendment rights while fostering children, they continued the application process and received their foster care license from MDHHS on October 23, 2017 (Declaration at ¶ 5).

- The Johnsons are currently licensed for up to three children, but are keeping one of those spots available for their grandson. Their license is attached hereto and to their Declaration (Declaration at ¶ 5).

- On November 1, 2017, the Johnsons agreed to take in a 12 year-old that had been previously placed in foster care, in which that home's licensing was expiring, and the child's father had died on October 26, 2017. The child has been in the Johnson home as a foster child since November 13, 2017 (Declaration at ¶ 6).

- The Johnson's concerns regarding the Second Amendment issues in this lawsuit have been the same since the beginning of this lawsuit, from the time their grandson was placed with them and they were subjected to the firearms restrictions and threatened by the MDHHS caseworkers, through the time their license application was pending, through the present now that their license has been approved and granted (Declaration at ¶ 7).

- Plaintiff Brian Mason is 36 years old, and resides with his family in Ontonagon, Michigan. Brian has been the Pastor at the Ontonagon Baptist Church in Ontonagon, Michigan for nine years. He is also the Chair of the Ontonagon County Department of Health and Human Services Board. Prior to that, he started

a church on Drummond Island, Michigan.  Brian also possesses a Michigan Concealed Pistol License and is an NRA certified range officer.  In sum, he has many solid connections to the State of Michigan and the Ontonagon area, including his wife and the two of his three children who still reside in the area (Complaint at ¶ 13).

- Plaintiff Naomi Mason resides with her family in Ontonagon, Michigan, is a published author and substitute librarian in Ontonagon, and thus has strong connections to Ontonagon and the State of Michigan (Complaint at ¶ 14).

- The Johnsons and the Masons are allowed to possess and bear firearms in Michigan generally, but are prohibited by the MDHHS policy complained-of herein from possessing and bearing firearms for self-defense so long as they currently are foster parents or plan to be foster parents in the future (Complaint at ¶ 15).

- The Johnsons would possess and bear loaded and functional firearms for self-defense and defense of family, but refrain from doing so because they fear their foster child/grandchild being taken away from them by the State, and/or being prohibited from being foster parents in the future, all due to the MDHHS policy complained-of herein (Complaint at ¶ 16).

- The Masons would become foster parents in the State of Michigan, but have refrained from doing so, because they know that if they do they would be prohibited from possessing and bearing loaded and functional firearms for self-defense, and defense of family, at the risk of their foster children being taken away

from them by the State, and/or being prohibited from being foster parents in the future, all due to the MDHHS policy complained-of herein (Complaint at ¶ 17).

- SAF is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF's membership includes foster and adoptive parents residing in Michigan. SAF has over 650,000 members and supporters nationwide. The purposes of SAF include education, research, publishing, advocacy, and legal action focusing on the Constitutional right privately to own, possess, and bear firearms. SAF brings this action on behalf of itself and its members (Complaint at ¶ 18).

- Members of SAF who are or would be foster and/or adoptive parents would bear loaded and functional handguns for self-defense, but refrain from doing so because they fear their foster children being taken away from them by the State, and/or being prohibited from being foster parents in the future, all due to the MDHHS policy complained-of herein (Complaint at ¶ 19).

- William and Jill Johnson are members of SAF (Complaint at ¶ 20).

- Brian and Naomi Mason are members of SAF (Complaint at ¶ 21).

- Defendant Lyon is the Director of the Michigan Department of Health and Human Services. In Lyon's official capacity, he is responsible for enforcing certain of Michigan's laws, customs, practices, and policies, specifically those challenged herein. In that capacity, Lyon is presently enforcing the laws, customs, practices and policies complained of in this action. Specifically, Lyon is the

authority charged with processing and administering the foster parenting system in Michigan. He is sued in his official capacity (Complaint at ¶ 22).

- Michigan DHHS Foster Care Rules states:

  R 400.9415 Hazardous materials. Rule 415. (1) A foster parent shall follow the agency's hazardous materials policy. (2) Dangerous and hazardous materials, objects, weapons, chemicals, medication, or equipment that may present a risk to children placed in the foster home shall be stored securely and out of the reach of children, as appropriate for the age and functioning level of the children.
  (3) Firearms are subject to the following conditions: (a) Stored in a locked metal or solid wood gun safe or (b) Trigger-locked and stored without ammunition in a locked area. (c) Ammunition shall be stored in a separate locked location. (d) A handgun shall be registered. Documentation of the registration of the handgun shall be available for review. History: Eff. January 1, 2001, Am. Eff. January 5, 2015."

(Complaint at ¶ 26.)

## ARGUMENT

### F.R.Civ.P. 12(b)(6) Standard

"In considering a motion to dismiss, 'the court must construe the complaint in a light most favorable to the plaintiff, and accept all of [the] factual allegations as true." *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). "A motion to dismiss under Rule 12(b)(6) should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

The Court should "construe all facts 'in the light most favorable to the plaintiff and accept all allegations as true.' *Id.* To state a claim sufficient to survive a motion to dismiss, the plaintiff's '[f]actual allegations must be enough to raise a right to relief above the speculative level' and must state a claim that is 'plausible on its face.'" *Faparusi v. Case W. Reserve Univ.*, 2017 U.S. App. LEXIS 19593 at *5 (6th Cir. 2017) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

A well-pleaded complaint may proceed even if it appears "that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp.*, 550 U.S. at 556.

## F.R.Civ.P. 56 Standard

"Summary judgment is appropriate where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed. R. Civ. P. 56(c). We must review the evidence and draw all reasonable inferences in the light most favorable to the non-moving party." *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law.'" *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

## I. <u>THE PLAINTIFFS HAVE STANDING TO BEING THIS SUIT.</u>

*Individual Plaintiffs*

"Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts; and a judicial decision in the plaintiff's favor would redress the injury." *Ezell v. City of Chicago*, 651 F.3d 684, 695 (7th Cir. 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)).

The Johnsons, as licensed foster parents, are directly injured by the Defendant's challenged Rule in the infringement of their constitutional rights (*See Ezell*, 651 F.3d at 699 (infringements of Second Amendment, like those of First Amendment, cannot be compensated by damages and constitute irreparable harm)), and a judicial ruling in their favor would redress their injury.

The Masons also have standing, as they are asserting a valid pre-enforcement challenge. As the Sixth Circuit has noted:

> In the present case, Plaintiffs have brought a pre-enforcement challenge pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a). A declaratory judgment generally is sought before a completed injury-in-fact has occurred. *Magaw*, 132 F.3d at 279; *Pic-A- State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 (3d Cir.), *cert. denied*, 517 U.S. 1246, 135 L. Ed. 2d 194, 116 S. Ct. 2504 (1996). Nevertheless, when seeking declaratory or injunctive relief, the plaintiff must demonstrate actual present harm or a significant possibility of future harm to justify pre-enforcement relief. *Magaw*, 132 F.3d at 279; *Bras v. California Pub. Utilities Comm'n*, 59 F.3d 869, 873 (9th Cir. 1995), *cert. denied*, 516 U.S. 1084, 133 L. Ed. 2d 748, 116 S. Ct. 800 (1996). Still, it is clear

> that an individual does not have to await the consummation of
> threatened injury to obtain preventive relief. Rather, if the
> injury is certainly impending, that is sufficient. *Babbitt v.
> United Farm Workers Union*, 442 U.S. 289, 298, 60 L. Ed. 2d
> 895, 99 S. Ct. 2301 (1979).

*Peoples Rights Org. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998).

This fits the instant situation perfectly. The Masons stand to lose their

constitutional Second Amendment rights if they enter the foster care system. This

is the written policy, and everyone is well aware of what the Johnsons are going

through. In fact, the Masons allege in the Complaint that the certain infringement

of Second Amendment rights is the only reason they are not participating in the

foster care system. There is therefore a significant risk of future harm justifying

pre-enforcement relief. Declaratory relief is appropriate, and that means the

Masons have standing to seek such relief.

## Organizational Plaintiff

> [A]n association has standing to bring suit on behalf of its
> members when its members would otherwise have standing to
> sue in their own right, the interests at stake are germane to the
> organization's purpose, and neither the claim asserted nor the
> relief requested requires the participation of individual
> members in the lawsuit." *Sierra Club 2015*, 793 F.3d at 661
> (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.
> (TOC), Inc.*, 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610
> (2000)). To establish organizational standing, "plaintiff-
> organizations [must] make specific allegations establishing that
> at least one identified member had suffered or would suffer
> harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498, 129 S.
> Ct. 1142, 173 L. Ed. 2d 1 (2009). Such specificity requires that
> the plaintiff-organization "name the individuals who were
> harmed" unless "all the members of the organization are
> affected by the challenged activity." *Id.* at 498-99.

*Tenn. Republican Party (16-3360) v. SEC*, 863 F.3d 507, 520, (6th Cir. 2017).

SAF meets all three requirements. Its members who are or plan to be foster parents, including the Johnsons and Masons, have standing in their own right.

Further, the interests at stake are very much on point with SAF's organization purpose. SAF has been advocating for Second Amendment rights for decades, and has been a Plaintiff in lawsuits across the United States, from *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), *Veasey v. Wilkins*, 2015 U.S. Dist. LEXIS 53894 (E.D.NC 2015), to *Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017), just to name a few. Further, on the specific issue raised in this lawsuit, SAF is also a Plaintiff in *Shults v. Sheldon*, 2:16-CV-2214 (C.D.Ill.), and was a Plaintiff in *Pursley v. Lake*, 5:16-CV-14 (W.D.OK), both of which involve(d) Second Amendment rights and foster parents.

Finally, the challenge to the MDHHS policies do not require individual participation. However, since it is alleged that the Johnson and Mason Plaintiffs are members of SAF, the standing requirement is additionally met.

Further, it is clear the Johnsons and Masons have standing to bring this suit, and once one Plaintiff has standing, jurisdiction is secure and further inquiry into standing is unnecessary. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263-64 (1977).

Finally, the Defendant claims that facial challenges are improper in the Second Amendment context, but *McDonald*, *Ezell*, and *Moore* were all facial challenges. Further, as the only types of constitutional challenges are facial and as-

applied, such as in, *e.g.*, *Veasey v. Wilkins*, 2015 U.S. Dist. LEXIS 53894 (E.D.NC 2015), so it frankly makes no sense for Defendant to be arguing that Plaintiffs cannot assert standing under either theory. *See*, *e.g.*, *United States v. Brown*, 327 Fed.Appx. 526, 520, 533 (6th Cir. 2006). Plaintiffs' Complaint alleges challenges to Rule 400.9415 both facially and as-applied. In practice however, "[t]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). In any event, Plaintiffs have demonstrated standing to assert both types of challenges.

## II.     <u>THIS MATTER IS RIPE.</u>

The Defendant cites to *Enhance, Inc. v. Snyder*, 16 CV 11854 (E.D.Mich.) (Dkt. #9-13) for the incorrect argument that this matter is not ripe, but in *Enhance*, the plaintiffs has not applied for an adult foster care license, so the Court could not judge how the granting of a license would affect the plaintiffs' possessory rights in their homes due to the possible application of the Adult Foster Care Licensing Act (Dkt. #9-13 at p.10). Further, the Court noted the defendant's insistence that the plaintiffs' rights would not be affected (Dkt. #9-13 at pp. 10-11). The Court found the plaintiffs were in essence seeking an advisory opinion (Dkt. #9-13 at pp. 12).

In contrast, the policy challenged in this suit is not speculative. It actually exists, and the Defendant has made perfectly clear the firearms policy is to be

enforced.  The Johnsons were threatened over it, and were repeatedly told they would have to choose between their grandson and their Constitutional rights.  Further, the Johnsons have not only applied for a foster care license, but they have received one.  This matter is therefore ripe not only for them, but also for SAF, of which the Johnsons are members.

This leaves the Masons, who, as noted above, assert a valid pre-enforcement challenge.  As was applicable to the standing argument, the Masons demonstrate a significant possibility of future harm justifying pre-enforcement relief.  The Masons do not have to actually suffer the injury; it is enough that the injury is impending. *Peoples Rights Org.*, 152 F.3d at 527.

As discussed above, the Masons stand to lose their Second Amendment rights if they take part in Michigan's foster care system due to R. 400.9415.  Because of the significant risk of future harm justifying pre-enforcement relief, declaratory relief is appropriate (for all Plaintiffs) and this matter is ripe for granting it.

## III.    THE *BURFORD* ABSTENTION DOCTRINE DOES NOT APPLY.

"Since abstention is an 'extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it,' 'only the clearest of justifications' will warrant abstention."  *Rouse v. DaimlerChrysler Corp. UAW Non-Contributory Plan*, 300 F.3d 711, 715 (6th Cir. 2002) (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813-19 (1976)).

A *Burford* abstention "applies only if a federal court's decision on a state law issue is likely to 'interfere with the proceedings or orders of state administrative

agencies.' *See New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 361, [ ] (1989). The *Burford* abstention should not be applied unless: (1) a case presents 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar,' or (2) the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Rouse*, 300 F.3d at 716 (citing *Colorado River*, 424 U.S. at 814 (discussing *Burford*)).

Defendant is arguing, in effect, that his actions are not subject to federal oversight, that he can violate the Defendant's constitutional rights and this Court should step aside because he claims it is "a matter of state policy." Not only is that exceedingly arrogant, it is also legally incorrect.

In support of Defendant's argument that federal courts should simply stay out of the business of judicial review of state's unconstitutional actions, Defendant cites to the namesake *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). However, *Burford* dealt with a unique situation, which underscores why the doctrine does not apply to this case. In *Burford*, the Texas Legislature enacted a comprehensive scheme to deal with the state's oil and gas industry, including the preservation of resources. *Id.* at 320-21. Since the drilling of a new well may affect existing wells miles away, especially since it was possible to draw the oil not only from under one's own land, but also from under neighboring plots, the granting of a new well permit was handled by the State Railroad Commission, but by state statute all litigation

regarding new well permits was to be handled in one particular county court, so the rulings would be consistent. *Id.* at 325. It was under that peculiar scenario that the *Burford* Court ruled the specific permit dispute should be handled not by a federal Court sitting in diversity, but in the state court the Texas statute contemplated handling those matters. *Burford* was not a blanket abstention as to the review of state actions just because the state labels it "state policy."

> "*Burford* 'does not require abstention whenever there exists [a complex state administrative process], or even in all cases where there is a 'potential for conflict' with state regulatory law or policy.' *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 362, 105 L. Ed. 2d 298, 109 S. Ct. 2506 (1989) (quoting *Colo. River*, 424 U.S. at 815-16). Instead, 'This balance only rarely favors abstention, and the power to dismiss recognized in *Burford* represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.' *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728, 135 L. Ed. 2d 1, 116 S. Ct. 1712 (1996) (quotation omitted)."

*AmSouth Bank v. Dale*, 386 F.3d 763, 783 (6th Cir. 2004).

The Defendant is essentially arguing that the State should be allowed to set its own firearms policy as pertaining to foster parents, regardless of its unconstitutional infringement of the Plaintiffs' Second Amendment rights, but the Defendant's proposal was specifically rejected in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010). In *McDonald*, the City of Chicago, in attempting to maintain its ban on home handgun possession, argued that it should be free to decide for itself what were reasonable gun control measures, and to implement them. *Id.* at 3046. The Supreme Court rejected this notion, ruling that when a Bill of Rights guarantee is fundamental and binding on the states, then the State is limited in its ability "to

devise solutions to social problems that suit local needs and values." *Id.* In other words, what the Defendant argues is important social policy with which the State should be left alone, is really just the unconstitutional deprivation of rights which perfectly fits within this Court's jurisdiction to remedy.

Further, the Sixth Circuit has repeatedly declined *Burford* abstention, noting that: "[i]n *GTE North, Inc. v. Strand*, 209 F.3d 909 (6th Cir.), *cert. denied*, 531 U.S. 957 (2000), we reasoned that *Burford* abstention is inapplicable in a 'case that does not concern a disputed issue of state law, but rather a potential conflict between state and federal . . . laws.'" *Habich v. City of Dearborn*, 331 F.3d 524, 533 (6th Cir. 2003) (quoting *GTE North, Inc.* at 921).

In this case, while Defendant claims the entire foster care system is categorically a generic matter of important state interest, this lawsuit affects one Rule that in way affects the entire system. And while a judgment in Plaintiffs' favor would affect the enforcement or existence of said Rule, in no way does this conflict with any state court action; indeed, the federal Court is exactly where this matter should be heard.

## IV. THE PLAINTIFFS' SECOND AMENDMENT RIGHTS CANNOT BE INFRINGED JUST BECAUSE THEY FOSTER OR ADOPT CHILDREN THROUGH THE STATE.

The Second Amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

The Second Amendment "is fully applicable against the States." *McDonald v. City of Chicago*, 561 U.S. 3025, 130 S. Ct. 3020, 3026 (2010).

The Amendment protects the right to "keep" as well as to "bear" operable arms, *i.e.*, "to *possess and carry* weapons in case of confrontation." *Heller*, 554 U.S. at 592 (emphasis added).

*Heller* considered whether Washington D.C.'s "prohibition on the possession of usable handguns in the home violates the Second Amendment . . . ." *Id.* at 573. The Court found that the requirement that firearms "be rendered and kept inoperable . . . makes it impossible for citizens to use them for the core lawful purpose of self-defense . . . ." *Id.* at 630. And it held that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. "A statute . . . which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional." *Id.* at 629, quoting *State v. Reid*, 1 Ala. 612, 616-617 (1840).

St. George Tucker wrote: "Wherever . . . the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction." Tucker, *View of the Constitution of the United States,* 1 BLACKSTONE'S COMMENTARIES, ed. app. at 300 (1803). *Heller* endorsed this passage from Tucker. 554 U.S. at 606.

The constitutional text states categorically that the right "shall not be infringed." It is ludicrous that the First Amendment prohibition on "abridging the

freedom of speech, or of the press" means that such freedom may be prohibited based on a legislative declaration, or agency policy, that the right is too dangerous to allow. The mere possibility of accidents does not justify prohibiting responsible persons from keeping operable arms, as "the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Id.* at 636.

Indeed, the fundamental right of self-defense is severely restricted by the Defendant's Rule 400.9415, as a locked-away firearm with no readily-available ammunition is of little help for those whose homes are being invaded, especially since one rarely has any advance warning before the intruder kicks in the door and breaks into the home. In such situations, every second counts, and the MDHHS firearms Rule robs homeowners of those valuable seconds, if not destroys the practical ability for self-defense entirely.

Defendant states that "the rule does not prevent firearm ownership or possession; it does not bar a licensed foster parent from actively bearing arms, or using them for self-defense or sporting purposes," (Dkt. # 9 at p.38), but this is disingenuous. By requiring that any firearms be unloaded, locked away, inaccessible, outfitted with trigger locks, and separate from the also locked-up ammunition, it is clear the Second Amendment right has been destroyed in foster homes. Indeed, Defendant's position and intent is obvious just from the fact that the Rule restricting the possession and bearing of firearms for self-defense and defense of family is entitled "Hazardous Materials."

Defendant cites with approval to *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), but the safe storage requirements in that case (as in this case) were completely contradictory to the Supreme Court's ruling in *Heller* that the Second Amendment protects law-abiding persons' right to keep and bear functional readily-available firearms for lawful purposes, most notably in the home. Therefore, Plaintiffs assert this Court should follow *Heller*, as opposed to *Jackson*.

"[T]he Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts," *Moore v. Madigan*, 702 F.3d 933, 939 (7th Cir. 2012). Nevertheless, Defendant tries to justify the MDHHS policy on the implied claim that armed, law-abiding citizens pose a threat to foster children.

Again, Plaintiffs do not deny that the State has a compelling interest in public safety, including/especially that of children. However, the Rule's restrictions cut right into the core of the Second Amendment right as stated in *Heller.*

Foster homes are not sensitive areas just because the Defendant claims they are. They are still peoples' homes, where the Second Amendment right is acute, and they no more become sensitive areas than they are when natural or adopted children are in the home. It is extremely disingenuous to compare someone's home to a school just because a foster child is there.

Additionally, this case is not about allowing foster children unsecured firearms. Instead, this case is about the honest ability to armed self-defense measures, such as the right to carry a firearm on one's person or in one's vehicle. It

is about the right to keep a loaded firearm by one's bed in case of attack, even if that firearm is stored in a gun safe. This case is not about some (Defendant) imagined right to act recklessly or stupidly with firearms, or to leave firearms unsecured so that children (foster or otherwise) can have free access to them. Defendant seems to have fashioned his Rule on the most negligent, horrible consequence he can conceive, but *Heller* allows that law-abiding persons can safely keep and bear arms. All Plaintiffs ask is that they not forfeit that right just because they participate in the foster care system. It is not fair to them, or the children awaiting placement.

Defendant claim the Rule is nothing but a safe storage law, but the effect is far more ominous, in that the plain language forbids the carry of firearms (regardless of whether foster children are present or not), and forbids having readily-available functional firearms in the home, even on one's person, for self-defense purposes.

In Defendant's Motion, and in the Defendant's *amicus* briefs, there is also research cited, but it is contradicted and at best cannot be parsed out in a Motion to Dismiss. In particular, Defendant and his *amici* cite to authorities that allegedly show that a gun kept in the home for self-defense is dangerous to children in the home. This research has been debunked by (1) the National Research Council (NRC) of the National Academies of Science and (2) the Centers for Disease Control (CDC).

The NRC reviewed the body of firearms literature, and concluded that the studies: (i) utterly failed to establish that gun ownership increased the risk of

violence to the owner, (ii) were incapable of throwing light on "the impact of firearms on homicide or the utility of firearms for self-defense," and (iii) made conclusions "that owning firearms for personal protection is 'counterproductive' and that 'people should be strongly discouraged from keeping guns in the home'" that were simply "not tenable." FIREARMS AND VIOLENCE: A CRITICAL REVIEW 118-19 (Charles F. Wellford *et al.* eds., 2005) (citation omitted).

The CDC likewise found that the research was flawed and "inconsistent" and as a result there was "insufficient evidence" to conclude that firearms injury can be reduced either by "[b]ans on specified firearms or ammunition" or by requiring gun owners "to store . . . firearms locked . . . [or] unloaded" in the home. *See First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Early Childhood Home Visitation and Firearms Laws*, 52 MORBIDITY & MORTALITY WEEKLY REP. 15, 17-18 (Oct. 3, 2003), available at www.cdc.gov/mmwr/PDF/rr/rr5214.pdf; Robert Hahn *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40, 40, 49, 56 (2005).

Armed civilians, even though they greatly outnumber police officers, make far fewer mistakes with their firearms than do the police. Each year there are approximately thirty instances in which a civilian mistakenly shoots and kills an innocent individual who was not actually a burglar, mugger, or similar assailant—but "[o]ver the same period the police erroneously kill five to eleven times more innocent people." *See* JOYCE LEE MALCOLM, *GUNS AND VIOLENCE: THE*

*ENGLISH EXPERIENCE* 239 & n.71 (2002). Further, armed civilians are an asset to public safety: "Regardless of which counts of homicides by police are used, the results indicate that civilians legally kill far more felons than police officers do." *See* Gary Kleck, *Keeping, Carrying, and Shooting Guns for Self Protection*, in DON B. KATES, JR. & GARY KLECK, THE GREAT AMERICAN GUN DEBATE: ESSAYS ON FIREARMS & VIOLENCE 199 (1997).

In fact, the Defendant's firearm Rule has an especially severe impact on those who are least capable of defending themselves against more physically powerful assailants while they are struggling to open a gun-safe or get to the separate location where the ammunition is stored in order to load the firearm. In general, women are smaller and less muscular than the male criminals who prey on them, and every second of delay that the Defendant's policy imposes on its female foster parents could be the difference between life and death. When these potential consequences are considered, the Defendant's Rule is particularly harsh, and results in a decision that the Defendant passes off cavalierly (If the Plaintiffs want Second Amendment rights, don't be a foster parent), but is truly much more complicated and untenable than that.

Using the two-step framework laid out in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the Defendant's firearms rules and policies cannot survive constitutional scrutiny. As in *Ezell*, Plaintiffs are the law-abiding responsible citizens who have full Second Amendment rights under *Heller*. 651 F.3d at 708. Banning functional firearms from home use clearly implicates Second Amendment

rights (*See Heller*, 554 U.S. at 636).  Because the Defendant's rules and policies strike at the core of the Second Amendment right (*Id.* at 630), strict scrutiny applies.

The Defendant's and MDHHS's stated reason of protecting foster children is almost certainly considered a compelling interest; in fact, the Plaintiffs bring this suit so that they may be better able to protect foster children and the rest of their families.  To that end, the Rule does not impose a temporary restriction, as the Defendant claims, but a categorical stripping of the Second Amendment right on all persons who serve as foster parents.  Defendant's attitude towards this is apparent as Defendant compares those who provide foster care to those who have had orders of protection entered against them (Dkt. #9 at p.29).

However, compelling interest granted, the Defendant's Rule is not narrowly tailored to achieve that interest.  While the answer to this issue may lie in the eventual expert testimony, it is clear that firearms have successfully been used for self-defense many times, which is something the State very much wants to ignore.

At least 19 professionally conducted national surveys have specifically asked respondents whether they had used a gun for self-protection. Despite wide variation in the details of the surveys, all indicated huge numbers of defensive gun uses each year, ranging from 800,000 to 3.6 million (Kleck, Gary, *The Frequency of Defensive Gun Use*, Chapter 6 in Armed, edited by Gary Kleck and Don B. Kates. NY: Prometheus Books., pp. 214-229 (2001)). The most technically sound of the surveys indicated there were 2.5 million defensive gun uses in 1992 (Kleck, Gary and Gertz,

Marc, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, J. of Criminal Law and Criminology, v.86, n.1, pp.150-187 (1995)).

That survey indicated that 36% of the defensive uses were carried out near but not in the defender's home and another 27% were carried out in locations that were neither near nor in the defender's home (*Id.* at 185). This leaves 37% of the defensive gun uses to have occurred in the defender's home. Thus, anywhere from 296,000 to 1,332,000 defensive uses in 1992 occurred in the defender's home, and anywhere from 288,000 to 1,296,000 defensive uses in 1992 occurred near the defender's home.

Since crime rates are only about half as high today as in 1992, the number of defensive gun uses is probably likewise about half what it was back then - perhaps about 1.25 million. Nevertheless, the number of defensive uses is still enormous. As a point of reference, in 2014 about 466,110 crimes were committed with firearms, including both crimes reported to the police and crimes not reported (U.S. Bureau of Justice Statistics. 2016. *Criminal Victimization, 2014.* Revised September 29, 2015. Available online at http://www.bis.gov/content/pub/pdf/cvl 4.pdf, p.3). Defensive uses of guns by crime victims therefore appears to be about three times more common than crimes committed by offenders using guns.

Further, when people defend themselves with firearms, they are less likely to be injured or lose property than crime victims in otherwise similar circumstances who use other defensive strategies or who do not resist. Any position to the contrary is inconsistent with the best available research evidence.

Defensive gun use (DGU) is effective as well as frequent. The best available evidence on the effect of DGU on whether the victim is injured or loses property was generated in a series of analyses of data generated by the U.S. Census Bureau's National Crime Victimization Survey, which provides detailed information on self-protective actions about the largest available, nationally representative sample of crime victimization incidents that Gary Kleck conducted with a series of colleagues (Kleck, Gary. *Crime Control Through the Private Use of Armed Force*, Social Problems 35(l):1-21 (1988); Kleck, Gary, and Susan Sayles, *Rape and Resistance*, Social Problems 37(2):149-162 (1990); Kleck, Gary, and Miriam DeLone, *Victim Resistance and Offender Weapon Effects In Robbery*, Journal of Quantitative Criminology 9(1):55-82 (1993); Tark, Jongyeon, and Gary Kleck. *Resisting Crime: The Effects of Victim Action on the Outcomes of Crimes.* Criminology, 42(4):861-909 (2004).

These studies uniformly indicate that crime victims who use guns in self-protection are less likely to be injured or lose property than otherwise similar crime victims who either used other self-defense strategies or did not resist at all. On the rare occasions that gun-using victims were injured, the injuries were inflicted on the victims before the victims used their guns defensively. Further, victims who defended themselves with guns tended to do so in more desperate circumstances, *i.e.* circumstances more threatening to the victim, than those who adopted other self-protection strategies. Gun users were more likely to be outnumbered, to be facing offenders with weapons, and to have already been injured before wielding the

gun in self-defense. It is therefore all the more impressive that gun defenders managed to come out of the crimes with so little harm. As one measure of success in avoiding harm, the Tark and Kleck (2004) analysis found that only 2.4% of crime victims who used guns suffered any kind of injury after the defensive gun use, and less than 1% suffered any injury more serious than cuts and bruises (p. 878).

Thus, there is substantial public benefit in allowing law-abiding citizens to possess firearms for self-defense purposes, a benefit that would be all but eliminated since foster parents are denied the right guaranteed in *Heller* to possess functional firearms for self-defense purposes of (at the least) hearth and home. The Defendant's rules and policies are not narrowly tailored to achieve their claimed benefit. At the least, Plaintiffs have stated a claim that the Defendant has violated the Plaintiff's Second Amendment rights. The Defendant's Motion to Dismiss should be denied.

## V. IT IS IRRELEVANT THAT LEGISLATIVE BILLS ARE PENDING.

Defendant argues that this matter should be dismissed or stayed due to the two bills pending in the Michigan Legislature – SB527 and HB4955. However, it is complete speculation whether either or both of those Bills will ever be enacted, and what they will look like in final form if ever enacted.

If a new law is passed that purportedly addresses the situation in this case, Plaintiffs will evaluate it at that time. It is pointless to speculate about something that may not happen at all, and Plaintiffs object to any attempt to delay or thwart this lawsuit based on such speculation.

This case is nothing like the situation in *Turner v. Snyder*, 1:12-cv-1095 (W.D.Mich.), where the Court abstained because a similar lawsuit had been filed in Michigan state court, which had already gone to oral argument in the Michigan Court of Appeals. *Id.* at pp.6-7. Here, there is no other lawsuit, the legislation (which, upon information and belief, was only introduced as a result of this lawsuit[1]) is pending and speculative, and this matter is ripe for review.

## VI.   THE DEFENDANT'S RULE VIOLATES THE FOURTEENTH AMENDMENT'S EQUAL PROTECTION AND DUE PROCESS CLAUSES.

Section 1 of the Fourteenth Amendment provides, in relevant part:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.*

U.S. Const. amend. XIV (emphasis added).

The Supreme Court has held:

> Our prior decisions recognizing right to privacy guaranteed by the Fourteenth Amendment included "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.' *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)." *Roe v. Wade*, 410 U.S. 113, 152 (1973). This privacy right encompasses and protects the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing.

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65 (U.S. 1973) (Emphasis added) .

In *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925), the Supreme Court stated:

"Under the doctrine of *Meyer v. Nebraska*, 262 U.S. 390 [(1923)], we think it

---

[1] It is also fair to speculate that the instant this lawsuit is dismissed pursuant to abstention, as Defendants request, the pending legislation will disappear as well.

entirely plain that the Act of 1922 [requiring public schooling for minors] unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control . . . [t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 534-535.

"It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. *Pierce v. Society of Sisters*, *supra*. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

While that principle apparently did not extend to Jehovah's Witnesses having their children selling religious literature on the street (*Id.* at 170-71), it does extend to parents exercising lawful self-defense measures to protect those children in case of violent attack.

These principles have been more recently affirmed in *Troxel v. Granville*, 530 U.S. 57 (2000). In *Troxel*, the Court held that the Application of Washington state child-visitation-rights statute to allow visitation rights to paternal grandparents violated the mother's Fourteenth Amendment due process right to bring up her children. The Court stated: "The Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.' We

have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.' *Washington v. Glucksberg*, 521 U.S. 702, 719, 138 L. Ed. 2d 772, 117 S. Ct. 2258 (1997). The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' 521 U.S. at 720; *see also Reno v. Flores*, 507 U.S. 292, 301-302, 123 L. Ed. 2d 1, 113 S. Ct. 1439 (1993). The liberty interest at issue in this case -- the interest of parents in the care, custody, and control of their children -- is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65.

It is perhaps more complicated to determine liberty interests when dealing with foster children, although that concern should not exist when dealing with the natural or adopted children who are in the home with foster children (both of whom are potentially endangered due to the Defendant's policies), though it is clear that the foster parents do have protectable interests in caring for their foster children.

Foster parents are to do the following for their foster children:

> Love and accept them without trying to replace their natural parents. Give them a normal family life and a feeling of belonging. Provide nutritious meals and give good daily care. See that their health needs are met. Give them the training and guidance that will help them become good citizens. Help them become a part of the community, by involving them in community recreational activities. Cooperate and work with the local educational system to ensure continuity of the foster child's education.

http://www.michigan.gov/mdhhs/0,5885,7-339-8319_8993-17572--,00.html

(last checked November 29, 2017).

Pursuant to MCLS § 722.121(2), foster parents have the right to due process as to any potential discipline of their license. Further, they have the responsibility to **"advocate for children in the foster parent's care." 20 ILCS 520/1-20(3).**

Further, the Tenth Circuit has recognized that foster relationships can be similar to natural-born relationships.

> [T]he Supreme Court has made clear that "biological relationships are not exclusive determination of the existence of a family." [*Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 843, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977) (hereinafter "*OFFER*")]. Although a biological relationship bears some import, the Court stressed that "the importance of the familial relationship, to the individuals involved and to the society," rests in part on "the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children." *Id*. at 844 (quotation and alteration omitted). "No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship." *Id*.

*Elwell v. Byers*, 699 F.3d 1208, 1215-1216 (10th Cir. 2012).

> The *OFFER* Court acknowledged that foster families and biological families differ in at least one important respect: Unlike biological families, "whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset." *Id*. at 845. Nonetheless, the Court indicated that the liberty interest in family association may extend to foster parents in certain circumstances: At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that

> the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family. For this reason, we cannot dismiss the foster family as a mere collection of unrelated individuals. *Id.* at 844.

*Elwell*, 699 F.3d at 1216.

> In *Spielman v. Hildebrand*, 873 F.2d 1377 (10th Cir. 1989), we applied *OFFER* to a case involving preadoptive parents. We noted that the status of preadoptive parents "differs significantly" from that of typical foster-care parents, who care for children on a temporary basis because the object of the preadoptive placement was to locate a "permanent, stable home." *Id.* at 1384. Although they "have not yet attained the status of adoptive parents, who like natural parents, have a protected liberty interest in their familial relationships with their children," preadoptive parents have a more "significant relationship than foster care because of the possibility of developing a permanent adoptive relationship." *Id.* at 1384. On this basis, we distinguished several sibling-circuit cases holding that typical foster families lack a protected liberty interest in maintaining the foster home. *Id.*

*Elwell*, 699 F.3d at 1216.

The Johnsons, who opted into the foster care system out of the MDHHS's request to take care of *their grandson*, and who have continued in their efforts to register to be foster parents to take care of other children, now being licensed in full, certainly fit into the category of protected individuals described in *Elwell*, as do many others in the State of Michigan. Likewise, the Masons, who wish to take care of needy children through the State's foster care system, but are deterred by the virtual relinquishment of their constitutional right to armed self-defense, fall into this category.

Given that this case deals with two fundamental rights – that of the right to raise children and the right to armed self-defense, the Defendant's firearms policy

must survive strict scrutiny. Governmental classifications are subject to strict scrutiny under the Equal Protection Clause if they burden a fundamental right or target a suspect class. *See Plyler v. Doe*, 457 U.S. 202, 216-217 (1982). "To survive strict scrutiny, the government must show that its classification is narrowly tailored to achieve a compelling government interest." *United States v. Virginia*, 518 U.S. 515, 524 (1996) (gender discrimination). The State's firearms policy, discriminating and burdensome as it is, does not meet this standard.

And this is especially stark when it is considered that parents with only natural or adopted children enjoy full rights of self-defense under the Second Amendment.  It is only when foster children are added to the mix that the right to armed self-defense dissipates. And if the foster parents decline to give up their right to armed self-defense, they risk losing their foster children and their future abilities to foster. This is a violation of both sides of the Fourteenth Amendment coin: Plaintiffs' equal protection rights and substantive due process rights.

To be clear, Plaintiffs are not arguing (contrary to Defendant's argument) that there is a fundamental constitutional right to be a foster parent, and thus the cases involving the rights of the family status of foster parents versus birth parents are irrelevant. *See, e.g., Procopio v. Johnson*, 994 F.2d 325 (7th Cir. 1993). Further, Plaintiffs do not dispute that the State has the ability to set foster parent qualification and training requirements, and to regulate the foster care system within constitutional limits, including things like "[t]he appropriateness, safety, cleanliness, and general adequacy of the premises, including maintenance of

adequate fire prevention and health standards to provide for the physical comfort, care, and well being of the children received." MCLS § 722.112(4)(e). However, the case law is clear that once one becomes a foster parent that certain liberty interests attach to that status.

Rather, the question is whether the State can condition the ability to be a foster parent on the foregoing of Second Amendment rights, and, once one is a foster parent who does enjoy a liberty interest, can that interest be threatened or revoked for exercising a fundamental constitutional right such as in the Second Amendment. In either case, the answer is no.[2]

Plaintiffs are also aware the District Court in *Jones v. Ada S. McKinley Community Services*, 1989 U.S. Dist. LEXIS 14312 (N.D.Ill. 1989) noted in *dicta* that foster parents are not a protected class, but Plaintiffs assert the law has evolved in the intervening 28 years, and it cannot be denied that foster parents are afforded at least some liberty interests when it comes to the care and raising of the children in their home. Further, the Supreme Court's holdings in *Heller* and *McDonald*, and the Seventh Circuit's ruling in *Moore*, unequivocally show that the Second Amendment right to armed self-defense is fundamental, both inside and outside the home. Whatever level of heightened scrutiny is applied to the Defendant's Rule 400.9415, the Rule does not meet the standard. Plaintiffs have stated a claim in their Complaint, and the Defendant's Motion to Dismiss, whether evaluated under Rule 12 or 56, should be denied.

---

[2] Although being as this is a Motion to Dismiss, at a minimum the answer should be to determine that on the merits after the discovery process.

## CONCLUSION

WHEREFORE, the Plaintiffs, WILLIAM JOHNSON, JILL JOHNSON,

BRIAN MASON, NAOMI MASON, and SECOND AMENDMENT FOUNDATION,

INC., requests this Honorable Court to deny the Defendant's Motion to Dismiss in

its entirety, and for any and all further relief as this court deems appropriate.

Dated: November 30, 2017                 Respectfully submitted,


                                /s/ David G. Sigale
                                Attorney for Plaintiffs


David G. Sigale (Atty. ID# 6238103 (IL))
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com

## CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING

The undersigned certifies that:

      1.    On November 29, 2017, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

      2.    Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.


                          /s/ David G. Sigale
                          Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103 (IL))
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
Tel: 630.452.4547
Fax: 630.596.4445
dsigale@sigalelaw.com