UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WILLIAM JOHNSON, ET AL.,                  )
                           Plaintiffs,    )
                                          )        No. 2:17-cv-124
-v-                                       )
                                          )        HONORABLE PAUL L. MALONEY
NICK LYON, IN HIS OFFICIAL                )
CAPACITY AS DIRECTOR OF THE               )
MICHIGAN DEPARTMENT OF                    )
HEALTH AND HUMAN SERVICES,                )
                           Defendant.     )
_____      )

## OPINION

Plaintiffs in this matter challenge a rule promulgated by the Michigan Department of Health and Human Services that mandates how foster parents store firearms in their home. Plaintiffs assert that the rule violates the Second and Fourteenth Amendments and seek a declaratory judgment and injunctive relief to have it declared invalid and to enjoin its enforcement. They have sued the Director of the Michigan Department of Health and Human Services, Nick Lyon, in his official capacity.

Now before the Court is Defendant Nick Lyon's motion to dismiss for failure to state a claim, or in the alternative, for summary judgment. For the reasons to be discussed, the Court concludes that Plaintiffs William and Jill Johnson have pleaded a plausible Second Amendment claim. However, Plaintiffs Brian and Naomi Mason will be dismissed from the action for lack of standing, and Counts II and III will be dismissed for failure to state a claim.

## I. Background

The following discussion of the facts is adapted from Plaintiffs' complaint, and for purposes of the instant motion, must be taken to be true.

## A. The Plaintiffs

### 1. The Johnson Family

William Johnson lives with his wife, Jill Johnson in Ontonagon, Michigan. Mr. Johnson is a veteran of the United States Marine Corps, and he possesses a Michigan Concealed Pistol License. On March 28, 2017, the State of Michigan removed the Johnsons' five-year-old grandson from his mother's custody. A state court then authorized the Michigan Department of Health and Human Services to take custody of the Johnson's grandson for care and supervision.

The Department placed the child with the Johnsons in a "relative care placement." Relative care placements are unlike typical foster care because the child is placed with a family member, and the Department does not require that the guardian be a licensed foster parent. However, the Johnsons began the licensing process anyway because the Department asked them if they would be willing to provide foster care to other children too.

When the Johnsons went to pick up their grandson, a caseworker searched Mr. Johnson. The employee demanded to see his concealed-carry license and stated that he would have to provide the serial numbers for any guns that he stored in his home. Mr. Johnson questioned the need to do so, and the caseworker allegedly responded, "If you want to care for your grandson, you will have to give up some of your constitutional rights." The employee declared that there "would not be a power struggle" over the Johnson's grandson—

if Mr. Johnson did not comply with the firearm-related requirements, the Department would take the child and place him in a foster home.

Two weeks later, the state court held a hearing to formalize the relative care placement. The judge allegedly said during the hearing, "We know we are violating numerous constitutional rights here, but if you do not comply, we will remove the boy from your home." The Johnsons complied with the Department's requirements and their grandson lived with them from April to August of 2017.

On August 1, 2017, the court ordered that the Johnsons' grandson be returned to his mother's care. But the Johnsons decided to continue with the foster care process even after these interactions with the Department. They received their foster care license on October 23, 2017 and are licensed to foster up to three children. On November 1, 2017, the Johnsons agreed to take a 12-year-old boy into their home as a foster child.

### 2. The Mason Family

Brian and Naomi Mason also live in Ontonagon, Michigan. Mr. Mason is a pastor with the Ontonagon Baptist Church and the Chair of the Ontonagon County Department of Health and Services Board. Mr. Mason possesses a valid Concealed Pistol License and is NRA-certified as a range officer. The Masons assert that they would become foster parents in Michigan, but they have refrained from doing so because they know that they would not be able to possess loaded, functional firearms in their home.

### 3. The Second Amendment Foundation

The Second Amendment Foundation is a non-profit corporation, formed and based in Washington. The Johnsons and Masons are members of the SAF. SAF was incorporated

with the purpose of advancing the constitutional right to privately own, possess, and bear firearms. It accomplishes its purpose through education, research, publishing, advocacy, and legal action on behalf of its members. The Court notes that SAF has represented its members in two similar suits in federal district court in Illinois and Oklahoma.

## B. Rule 400.9415

At issue in this suit is Rule 400.9415 of the Michigan Administrative Code ("Rule 415"), promulgated by the Michigan Department of Health & Human Services. That rule states:

> **R 400.9415 Hazardous materials. Rule 415.**
>
> (1) A foster parent shall follow the agency's hazardous materials policy.
>
> (2) Dangerous and hazardous materials, objects, weapons, chemicals, medication, or equipment that may present a risk to children placed in the foster home shall be stored securely and out of the reach of children, as appropriate for the age and functioning level of the children.
>
> (3) Firearms are subject to the following conditions:
>
> (a) Stored in a locked metal or solid wood gun safe or
>
> (b) Trigger-locked and stored without ammunition in a locked area.
>
> (c) Ammunition shall be stored in a separate locked location.
>
> (d) A handgun shall be registered. Documentation of the registration of the handgun shall be available for review.

## II. Posture of the Case and Standard of Review

Plaintiffs filed suit on July 17, 2017, raising three claims under 42 U.S.C. § 1983. The Department filed a motion to dismiss or for summary judgment in lieu of an answer on September 29, 2017. It asserts that the complaint should be dismissed for one or more of

the following reasons: lack of standing, unripe claims, *Burford* abstention, or for failure to state a valid constitutional claim. The Court held a hearing on June 7, 2018 and indicated that it was treating the instant motion as a motion to dismiss only and would not be considering the motion for summary judgment prior to any formal discovery. The Court also ordered supplemental briefing on the appropriate level of constitutional scrutiny for Plaintiffs' Second Amendment claim. The parties timely filed the briefs, and the motion is now ripe for resolution.

A complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A defendant bringing a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide sufficient factual allegations that, if accepted as true, are sufficient to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, and the "claim to relief must be plausible on its face" *Id.* at 570. "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556).

### III. Discussion

### A. Justiciability

The Department challenges the justiciability of Plaintiffs' claims, arguing that they lack standing, have not presented ripe claims, and are barred by abstention doctrine. The Department also requests that the Court stay the case due to pending legislation.

#### 1. Standing

Article III courts have limited jurisdiction—they hear "cases or controversies." U.S. Const. Art. III, § 2. The requirement that a plaintiff have standing "limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into 'a vehicle for the vindication of the value interests of concerned bystanders.'" *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915 (6th Cir. 2002) (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473, (1982)). A plaintiff's personal interest in the litigation must exist at the commencement of the suit and throughout the duration of the suit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000).

To establish standing, "a plaintiff must demonstrate (1) he or she has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) the injury is fairly traceable to the defendant's challenged action; and (3) it is likely, not speculative, that the injury will be redressed by a favorable decision." *Ailor v. City of Maynardville, Tenn.*, 368 F.3d 587, 596 (6th Cir. 2004) (citations omitted).

However, an action for a declaratory judgment, like here, is generally brought before a completed injury-in-fact has occurred. The plaintiff bringing the action has standing if he is able to demonstrate "actual present harm or a significant possibility of future harm to justify pre-enforcement relief." *Peoples Rights Organization v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998) (citing *National Rifle Ass'n v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)). "[I]t is clear that an individual does not have to await the consummation of threatened injury to obtain preventive relief. Rather, if the injury is certainly impending, that is sufficient." *Id.* (citing *United Farm Workers Union*, 442 U.S. 289, 298 (1979). The Sixth Circuit has further explained that "a citizen should be allowed to prefer 'official adjudication to public disobedience.'" *Magaw*, 132 F.3d at 287 (quoting WRIGHT & MILLER, *Federal Practice and Procedure*, § 2532.5 (2d ed. 1984).

The Court concludes that the Johnsons have demonstrated that they have standing. The Johnsons are licensed foster parents under a present obligation to abide by Rule 415. Thus, the Johnsons have alleged an injury-in-fact because they have been forced to behave in a manner that they believe violates their Second Amendment right to bear arms. The injury is obviously traceable to the Defendant, as the Head of the Department of Health and Human Services, the agency that promulgated the rule and issues foster care licenses. Finally, the matter is redressable because the Court has the ability to issue a declaratory judgment if it finds that Rule 415 violates the Johnsons' Second Amendment rights. *See, e.g., Aldens Inc. v. Ryan*, 454 F. Supp. 465 (W.D. Okla. 1976) (concluding that the threatened enforcement of an allegedly unconstitutional law satisfied the imminent risk of harm required for an action under the Declaratory Judgment Act). Accordingly, the Court determines that

the Johnsons have standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that injury-in-fact, causation, and redressability form "the irreducible constitutional minimum of standing").

However, the Court also concludes that the Masons do not have standing because they have failed to demonstrate actual present harm or a significant possibility of future harm. *Peoples Rights Org.*, 152 F.3d 527. Instead, they have presented only a "'generalized grievance' shared in substantially equal measure . . . by a large class of citizens." *Magaw*, 132 F.3d at 294 (*quoting Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 414 (2013) ("[The Court] decline[s] to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").

Unless and until the Masons apply for a license, they are part of the broad class of gun owners with a generalized grievance against the Michigan Department of Health and Human Services. *See Magaw*, 132 F.3d at 294. Because "[t]he threat of [enforcement] against these plaintiffs is still abstract, hypothetical, and speculative[,]" they cannot "demonstrate the personal stake and interest necessary to give the litigation the concreteness required for Article III standing." *Id.* (citing *Raines v. Byrd*, 521 U.S. 811 (1997)).

Associations have their own rules relating to standing. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members

8

in the lawsuit." *Friends of the Earth Inc.*, 528 U.S. at 181 (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

SAF meets the criteria for associational standing. The Court has concluded that its individual members—the Johnsons—have standing. *Tennessee Republican Party v. SEC*, 863 F.3d 507, 520 (6th Cir. 2017) (quoting *Sierra Club 2015*, 793 F.3d at 661). The interests at stake in the case—the right to possess and bear arms within the home—are clearly germane to SAF's stated purpose. *Id.* And as the district court noted in *Peoples Rights*, "[b]ecause this is an action for declaratory and injunctive relief, the benefit of Plaintiff's success in this action will inure all members of [the organization] who would have had individual standing to challenge the ordinance[]. Their participation as individuals is not necessary." *Peoples Rights Org. v. City of Columbus*, 925 F. Supp. 1254, 1260 (S.D. Ohio 1996) *rev'd in part on other grounds*, 152 F.3d 522 (6th Cir. 1998). Thus, the third requirement is met, so SAF has demonstrated it has associational standing to participate in this suit.

Additionally, the Department argues that the Plaintiffs have not established standing for a facial challenge to Rule 415. It asserts that "no circuit has accepted an overbreadth challenge in the Second Amendment context[,]" and that "[c]ourts similarly reject facial challenges to statutes based on the Second Amendment." (ECF No. 9 at PageID.189–90.) In response, Plaintiffs note that several recent Second Amendment decisions of the Supreme Court and Courts of Appeal resulted from facial challenges.

The Court concludes that the Plaintiffs have the better of the argument. The leading Supreme Court opinion on the Second Amendment, *Heller v. District of Columbia*, was a facial challenge, 554 U.S. 570, 635–36 (2008). The Supreme Court has since noted that,

"while [facial] challenges are 'the most difficult to mount successfully,'" they are not "categorically barred or especially disfavored." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2449 (2015) (concluding that facial challenge under the Fourth Amendment was cognizable by reference to *Heller*).

Plaintiffs have standing to assert a facial challenge in this matter because they allege that there is no set of circumstances in which Rule 415 would be valid. *Id.*; *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

The Department's quotations from and citations to *United States v. Chester* are unpersuasive. There, the Fourth Circuit held that a criminal defendant charged with violating 18 U.S.C. § 922(g)(9) could not assert a valid overbreadth challenge because the statute had been constitutionally applied to him. 514 F. App'x 393, 395 (4th Cir. 2011). *Chester* is distinguishable because it arises in the criminal context, and because the court had already concluded that the statute was constitutionally applied to the defendant. Because the defendant lacked individual standing to pursue his as-applied claim, he could not "challenge [the] statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Id.* (quoting *United States v. Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011).

Here, the Johnsons have standing to pursue their as-applied challenge as analyzed, *supra*. And they allege that the plain terms of Rule 415 restricts the conduct of all foster parents in a way that conflicts with the core right protected by the Second Amendment in all

cases. Thus, the Court concludes that Plaintiffs have standing to pursue a facial challenge to Rule 415, as did the plaintiffs in *Heller*.

2. Ripeness

The Department also argues that Plaintiffs' claims are not yet ripe. Like standing, ripeness "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The ripeness doctrine serves to "avoid[ ] . . . premature adjudication" of legal questions and to prevent courts from "entangling themselves in abstract debates" that may turn out differently in different settings. *Id.* at 807. In its broadest formulation, the ripeness doctrine poses "a question of timing" and counsels against resolving a case that is "anchored in future events that may not occur as anticipated, or at all." *Magaw*, 132 F.3d at 284.

Generally, courts look to three factors to "guide the ripeness inquiry: (1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings." *Berry v. Schmitt*, 688 F.3d 290, 298 (6th Cir. 2012) (internal quotation marks omitted).

"In declaratory judgment actions, it is often difficult to draw a line between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies." *Kardules v. City of Columbus*, 95 F.3d 1335, 1343 (6th Cir. 1996). As Justice Brennan explained in a unanimous opinion of the Supreme Court:

> The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). As the *Magaw* court later clarified, "A case is ripe for pre-enforcement review under the Declaratory Judgment Act only if the probability of the future event occurring is substantial and of 'sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Magaw*, 132 F.3d at 284 (quoting *Golden*, 394 U.S. at 108).

The Department argues that the Johnsons' claims are unripe because they have not alleged that their foster license was denied or terminated. Thus, Defendant argues that the Johnsons have not suffered an adverse action that would render the matter ripe, so their claims are speculative and insufficient to convey jurisdiction.

The Court disagrees. Agents of the Department made it clear to the Johnsons that the Department intended to enforce Rule 415—creating a significant possibility of future harm remediable by the Declaratory Judgment Act. And the Johnsons are under a present duty to follow Rule 415. The Department's argument that any harm is speculative is misguided because it misapprehends the "harm" caused by Rule 415. As pleaded, the Johnsons have suffered harm because they have been forced to choose between their Second Amendment rights and their foster care license for fear of enforcement of the Rule.

There would also be a significant hardship to the Plaintiffs if judicial review were denied. The Johnsons have demonstrated that the Department intends to enforce its rule. If the Court withheld review, the Johnsons would be forced to risk having their license revoked to vindicate their view of a constitutional right. This is precisely the predicament that the Declaratory Judgment Act was implemented to prevent. *See Peoples Rights Org.*, 152 F.3d at 530–31 (concluding that plaintiffs' claim that Columbus city ordinance violated the Second Amendment was ripe for review under the Declaratory Judgment Act based on pleading that they were "unable and unwilling, given the serious penalties involved," to engage in the prohibited conduct). In sum, the Court finds the claims presented to be ripe for review.

### 3. Burford Abstention or a Stay for Pending Legislation

The Department also asks the Court to decline jurisdiction in recognition of *Burford* abstention. *Burford* abstention applies only if a federal court's decision on a matter of state law is likely to interfere with the proceedings or orders of state administrative agencies. *New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989). The Sixth Circuit has squarely foreclosed the Department's theory of *Burford* abstention, ruling that it is inapplicable in cases that do not concern disputed issues of state law and instead involve potential conflicts between state and federal law. *Habich v. City of Dearborn*, 331 F.3d 524, 533 (6th Cir. 2003). The *Habich* court reasoned that *Burford* abstention was especially inappropriate where "the issue is not merely whether a state law is preempted by federal statute, but whether a state action violated constitutional limits." *Id.* Here, Plaintiffs claim that Rule 415 exceeds constitutional limits on the Second Amendment by forbidding

possession of functional firearms within the home. *Burford* abstention is patently inapplicable to such a claim.

The Department also claims that the Court should stay this action because two bills pending in the Michigan Legislature could moot the case in the future. Unless and until either of the bills become law, they are inconsequential to this action. The Court will not grant the motion to dismiss for *Burford* abstention, and it will not stay the case based on the potentiality of legislation in the future.

In conclusion, the Court finds that the Johnsons and SAF have established that their claims are presently justiciable—neither standing, ripeness, nor abstention bar judicial review of the claims presented. Accordingly, the Court will proceed to evaluate the Department's arguments that these Plaintiffs have failed to plead a plausible claim for relief. The Court will dismiss the Masons from this action for lack of standing.

## B. Merits

### 1. Second Amendment Claim

The Court must now proceed to analyze whether Plaintiffs have stated a plausible claim that Rule 415 violates the Second Amendment.

The Second Amendment declares that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II.

*Heller* explained that the Second Amendment, at its core, protected the right to bear lawful firearms in the home for immediate self-defense. 554 U.S. at 635. And the Fourteenth

14

Amendment incorporates the Second Amendment so that it is "fully applicable against the States." *McDonald v. City of Chicago*, 561 U.S. 742, 748 (2010).

In the wake of *Heller*, the lower courts devised a two-step framework for evaluating Second Amendment claims, which has been adopted by the Sixth Circuit. *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). Under the first prong, the court asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood. *Id.* (quoting *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *see also Ezell v. City of Chicago*, 651 F.3d at 702 ("*Heller* suggests that some federal gun laws will survive Second Amendment challenge because they regulate activity falling outside the terms of the right as publicly understood when the Bill of Rights was ratified."). If the challenged law regulates activity outside of the historical understanding of the Second Amendment, that is the end of the inquiry because the activity is "categorically unprotected" and not subject to Second Amendment review. *Greeno*, 679 F.3d at 518.

If the government cannot establish that the regulated activity falls outside the scope of the Second Amendment, then the Court must proceed to the second prong and determine whether the challenged law is subject to strict or intermediate scrutiny and whether it meets whichever level of scrutiny is appropriate. *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 690 (6th Cir. 2015) (en banc).

> a. *Step One: Does Rule 415 impinge on a right protected by the Second Amendment?*

The Department first argues that Plaintiffs have failed to state a claim because "nothing in [the] rule bars licensed foster parents from bearing arms to defend the home."

(ECF No. 9 at PageID.181.) Instead, it "merely requires that, when not in use, firearms must be safely stored in a foster family home." (*Id.*) Thus, the Department concludes that the unambiguous terms of Rule 415 do not implicate the Second Amendment. Plaintiffs claim that Rule 415 violates the Second Amendment because it requires firearms to be stored in locked gun cabinets or trigger-locked, with ammunition stored in a separate locked location. In their view, these requirements render their firearms useless for purposes of self-defense— the core right protected by the Second Amendment as explained in *Heller*.

Once again, the Rule states in its entirety:

R 400.9415 Hazardous materials. Rule 415.
(1) A foster parent shall follow the agency's hazardous materials policy.

(2) Dangerous and hazardous materials, objects, weapons, chemicals, medication, or equipment that may present a risk to children placed in the foster home shall be stored securely and out of the reach of children, as appropriate for the age and functioning level of the children.

(3) Firearms are subject to the following conditions:

(a) Stored in a locked metal or solid wood gun safe or

(b) Trigger-locked and stored without ammunition in a locked area.

(c) Ammunition shall be stored in a separate locked location.

(d) A handgun shall be registered. Documentation of the registration of the handgun shall be available for review.

Thus, the first merits question for the Court is whether the conduct regulated by Rule 415 is within the scope of the Second Amendment.

The Court concludes that it is. In *Heller*, the Court confronted a District of Columbia ordinance that, among other things, required residents to keep their lawfully-owned firearms

16

"unloaded and dissembled or bound by a trigger lock or similar device" unless located in a place of business or in use for lawful recreational activity. 554 U.S. at 574–75. The Court explained that the Second Amendment right to "keep and bear arms" safeguards the ability of "law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 634–35. And therefore, the District of Columbia ran afoul of the Second Amendment by its "prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635.

To be sure, Rule 415 is silent as to the *use* of firearms. It does not prohibit foster parents from carrying them, nor does it require foster parents to handle them in a particular manner. But like the *Heller* ordinance, it regulates how firearms are stored. *Compare* Rule 415(3)(a)–(c) *with Heller,* 554 U.S. at 574 (District of Columbia law required lawfully owned firearms in the home to be kept "unloaded and dissembled or bound by a trigger lock or similar device.").

Storing firearms in an inoperable condition makes them useless for the defense of hearth and home, which implicates the Second Amendment. *See Heller,* 554 U.S. at 630. The need for self-defense rarely comes with advance notice; it occurs spontaneously, often at times specifically chosen for the expected vulnerability of the intended victim.

For example, a foster parent cannot "use" a firearm while asleep. Thus, Rule 415 mandates that the gun be stored in a locked gun safe or trigger locked, and the ammunition must be stored in a separate locked location. If, during the night, the need arises for the foster parent to use the gun for self-defense, he or she must now retrieve the weapon from the gun safe, proceed to a "separate locked location" to retrieve the ammunition, and load

the gun. Only then would it be a functional firearm capable of defending hearth and home. Like the *Heller* ordinance, these significant constraints on self-defense within the home clearly implicate the Second Amendment; the Department's argument to the contrary must fail.

The Department also argues that Rule 415 falls outside the historical understanding of the Second Amendment for other reasons.

In *Heller*, the Supreme Court held the Second Amendment secures "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." But the Court was clear that the right, like other constitutional rights, is "not unlimited" and "include[s] exceptions." *Id.* at 595. While declining to delineate the full scope of the Second Amendment, the Court did articulate an illustrative list of presumptively lawful regulations:

> [N]othing in [this] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27, 627 n. 26.

The Department argues that Rule 415 fits within two of the presumptively lawful categories of government regulation: (1) possession of firearms in a sensitive area, and (2) the "longstanding tradition of targeting select groups' ability to access and use arms in the interests of public safety, including restrictions based on age." Thus, the Department believes Rule 415 falls outside the scope of traditional understanding of the Second Amendment, which would end the inquiry. The Court does not find either argument persuasive.

First, The Department argues that foster homes are analogous to schools because "both have temporary control over others' children." (ECF No. 9 at PageID.203.) Public areas fall within the "sensitive place" exception because they are important to the function of government or because the "possessing firearms in such places risks harm to great numbers of defenseless people . . . ." *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009).

Foster homes are obviously not such a place. They are *homes*. And considering one's home a "sensitive area" would eviscerate *Heller*'s clarification that "the need for defense of self, family, and property is most acute" in the home. 554 U.S. at 628. Certainly, a foster home—like any other home—is not a place where "great numbers of defenseless people" are found. *Nordyke*, 563 F.3d at 459.

Second, the Department asserts that, "caselaw allows a complete prohibition of firearms . . . from children." (ECF No. 9 at PageID.204.) The Department relies on a single Fifth Circuit opinion to support its argument. *National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, and Explosives.* 700 F.3d 185 (5th Cir. 2012). There, the Fifth Circuit reviewed a federal law prohibiting federal firearms licensees (FFLs) from selling handguns to 18-to-20-year-olds. *Id.* at 192. The law did not prohibit the use or possession of handguns by that group. *Id.* at 191 ("The government is correct that the challenged federal laws do not bar 18-to-20-year-olds from possessing or using handguns. The laws also do not bar 18-to-20-year-olds from receiving handguns from parents or guardians.") After an extensive review of tradition and historical legislation surrounding age-related restrictions on firearms, the court concluded that the conduct at issue—the ability of 18-to-20-year olds to

purchase handguns from FFLs—fell outside the Second Amendment's protection. *Id.* at 193–204.

For obvious reasons, the Court does not find this case helpful. Rule 415 directly burdens people *outside* of a vulnerable demographic to reach children, and it allegedly prevents them from using firearms in their homes. Such a restriction clearly falls within the Second Amendment's protection.[1] If Rule 415 only prohibited foster children from possessing or using firearms in foster homes, there may not be any constitutional issue. But Rule 415 is not structured like that. Plaintiffs have pleaded that it prevents them—as law-abiding, responsible citizens—from bearing arms to protect their home.

In short, the Court does not find that the Department has met its burden by showing that Rule 415 is outside the scope of the historical understanding of the Second Amendment.

### b. Step Two: Does Rule 415 plausibly fall short of the appropriate level of scrutiny?

Since the inquiry cannot end at the first step, the Court must "analyze 'the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights.'" *Tyler*, 837 F.3d at 691 (quoting *Greeno*, 679 F.3d at 518). To do so, the Court must select and apply the proper level of means-ends scrutiny. *Id.*

---

[1] If that is not immediately clear, imagine that the State of Michigan enacted a law requiring law-abiding citizens to keep their firearms dissembled in locked containers if they reside with a convicted felon. While laws preventing felons from possessing firearms are clearly outside the scope of the Second Amendment, this law could not pass muster at step one because it primarily affects conduct that is within the scope of the historical understanding of the Second Amendment. Such a law would then be scrutinized under the appropriate level of means-ends scrutiny. *See Greeno*, 679 F.3d at 518.

The choice of scrutiny is narrower than usual because *Heller* rules out rational basis review. 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). Thus, the choice is between intermediate and strict scrutiny. The level of scrutiny is "informed by (1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Tyler*, 837 F.3d at 691 (quoting *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) (internal quotations omitted)). In other words, "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify." *Heller II*, 670 F.3d at 1252.

The most relevant discussion of the choice of scrutiny from the Sixth Circuit comes from the court's en banc opinion in *Tyler*. 837 F.3d 678. There, the plaintiff challenged the federal ban on the possession of firearms by persons who had been committed to a mental institution at any time in the past under 18 U.S.C. § 922(g)(9). 837 F.3d at 682–684. Tyler had been involuntarily committed thirty years prior, after an emotional divorce. *Id.* at 683.

The original Sixth Circuit panel applied strict scrutiny to Tyler's Second Amendment claim. 775 F.3d 308, 328–29 (6th Cir. 2014). The court noted that the right to bear arms to protect hearth and home is a fundamental right and that regulations infringing on fundamental rights are usually, but not always, reviewed under strict scrutiny. It analogized between First and Second Amendment rights to conclude that strict scrutiny applied because courts invoked it more frequently than intermediate scrutiny in First Amendment suits. The

court continued, noting that intermediate scrutiny review was similar to the interest-balancing approach proposed by Justice Breyer and soundly rejected by the majority in *Heller*. Finally, and "perhaps most importantly," the court ruled that intermediate scrutiny was inappropriate because it had "no basis" in the Constitution, just as rational basis review is inappropriate for Second Amendment challenges.

The Sixth Circuit granted rehearing en banc and vacated the opinion. 837 F.3d 678. The lead opinion, written by Judge Gibbons, rejected strict scrutiny because it would "invert Heller's presumption that prohibitions on the mentally ill are lawful." *Id.* at 692. Because the law "burden[ed] only a narrow class of individuals who [were] not at the core of the Second Amendment[,]" it did not strike at the heart of Second Amendment protection, so strict scrutiny would not apply. *Id.* Instead, intermediate scrutiny was appropriate. To date, the Sixth Circuit has never applied strict scrutiny to a Second Amendment challenge under the *Greeno* framework. But Judge Gibbons was careful to limit the holding in *Tyler*, cautioning that the court was "not suggest[ing] that strict scrutiny will never be applicable in a Second Amendment challenge to a gun regulation." *Id.* at n.12; *see also Stimmel v. Sessions*, 879 F.3d 198, 206 (6th Cir. 2018) (explaining that the preference of appellate courts has been to apply intermediate scrutiny to § 922(g) challenges and citing *Tyler*).

The choice between strict and intermediate scrutiny is an especially close question of law under the facts of this case.

Rule 415 burdens core Second Amendment conduct because it regulates law-abiding, responsible citizens, and their ability to bear firearms within their home for self-defense. Foster parents are the definition of law-abiding citizens because the Department entrusts the

care of especially-vulnerable children within its custody to foster parents. It is difficult to conceive of a class of private citizens who receive a greater degree of trust from the government. Therefore, a case can certainly be made that strict scrutiny would apply because Rule 415 (1) affects law abiding citizens; and (2) regulates their ability to bear arms for self-defense in the home.

On the other hand, Rule 415 does not burden the public at large; it applies only to a narrow class of citizens who *volunteer* to assume the burdens and benefits of serving as foster parents. In other words, foster parents enter contractual relationships with the State to provide foster services knowing that they must make certain sacrifices—including reduced constitutional protections—to create an appropriate environment for foster children. *Cf. Hall v. Sweet*, 666 F. App'x 469, 477 (6th Cir. 2016) ("[H]omeowners voluntarily operating a child care business out of their home—knowingly subjecting that home to related regulatory oversight—have a reduced expectation of privacy there.").

Other considerations also weigh in favor of applying intermediate scrutiny. State agencies in charge of overseeing foster children should be afforded "considerable flexibility" in regulating health and safety concerns. *See Tyler*, 837 F.3d at 692. And in the most factually- analogous "safe-storage" case, the Ninth Circuit applied intermediate scrutiny. 746 F.3d 953, 959, 966 (9th Cir. 2014), *cert denied* 135 S. Ct. 2799 (2016) (upholding city-wide "safe storage" ordinance that imposed similar requirements to Rule 415). In light of these countervailing considerations, the Court concludes that intermediate scrutiny is the appropriate standard despite the Plaintiffs' strong argument for the application of strict scrutiny.

The question therefore becomes whether the Department has carried its burden by showing a substantial (or significant or important) state objective and a reasonable fit between the challenged regulation and the asserted objective. *See Tyler*, 837 F.3d at 693.

While all parties agree that the Department's objective of keeping foster children safe from gun violence meets the first prong of intermediate scrutiny, there is significant question as to the relationship between the stated objective and the reasonable fit. Under intermediate scrutiny, "[t]he burden of justification is demanding and it rests entirely on the State." *Id.* at 694 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Generally, courts have required "legislative findings, academic studies, or other empirical data is necessary to support the categorical disarmament of citizens . . . ." *Id.* (citing *Chester*, 628 F.3d at 674).

Given this case's present posture, the Court is limited to the pleadings and cannot say that the Department has met its burden. Plaintiffs have at least a plausible claim that Rule 415 as presently promulgated is not reasonably related to the Department's important stated objective.[2] Thus, the Court will deny the motion to dismiss.

2. Equal Protection

Plaintiffs also assert that the Department violated their right to equal protection by denying their right and privilege to possess and bear firearms for self-defense based solely on their status as foster parents:

**Count II – Violation of Equal Protection (citations omitted)**

¶ 29.   [Incorporating the prior allegations in the Complaint by reference]

---

[2] The court notes that the state apparently has not reviewed the contours of Rule 415 since <u>Heller</u> and subsequent cases have been adjudicated.

¶ 30. The MDHHS policy R 400.9415, and all other Michigan statutory language which restricts foster and adoptive parents, and would-be foster and adoptive parents, the rights and privileges of possessing and bearing firearms for self-defense and defense of family based solely on their status as foster and adoptive parents, on their face and as applied, are unconstitutional denials of equal protection of the laws and are in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

(ECF No. 1 at PageID.9.)

"To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Stimmel v. Sessions*, 879 F.3d 198, 212 (6th Cir. 2018) (quoting *Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011).

Plaintiffs' equal protection claim cannot survive the motion to dismiss. "It is absurd to assert that foster parents would qualify" as a suspect class because the protection is reserved for "discrete and insular minorities unable to utilize the political process to correct inequalities." *Jones v. Ada S. McKinley Community Servs.*, 1989 WL 105231(N.D. Ill. 1989); *see also id.* 1989 WL 152352 (holding that no authority supported plaintiffs' position that foster parents constituted a suspect class and ordering plaintiffs' counsel to pay expenses including attorney's fees as sanction under Rule 11 for bringing a frivolous claim). Plaintiffs argue unpersuasively that "the law has evolved" since *Jones* was decided, but cite no caselaw contradicting its holding or suggesting that foster parents are a suspect class. (ECF No. 29 at PageID.636.)

In addition to the failure to assert a suspect class, the paucity of facts relating to the existence of similarly-situated individuals dooms the Plaintiffs' claim. *See, e.g., Hall v.*

*Callahan*, 727 F.3d 450, 457 (6th Cir. 2013) (dismissing equal protection claim where plaintiffs had not identified similarly situated groups or explained how the contested statute treated them differently than similarly situated individuals). Consequently, the Court will grant the motion to dismiss Plaintiffs' equal protection claim.

3. Substantive Due Process

Substantive Due Process means that there is a constitutional limitation on government deprivations of life, liberty, or property regardless of the adequacy of pre-deprivation procedures. *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007) (quoting *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003)). These limitations provide "heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* (quoting *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000)). "As a result, 'Government actions that burden the exercise of those fundamental rights or liberty interests are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest.'" *Id.*

But the list of fundamental rights is short and not easily expanded. *Seal*, 229 F.3d at 575. Thus, "When reviewing a substantive due process claim, [the Court] must first craft a 'careful description of the asserted right . . . .'" *Doe XIV v. Mich. Dep't of State Police*, 490 F.3d 491, 500 (6th Cir. 2007) (citing *Reno v. Flores*, 507 U.S. 292, 302 (1993)). To qualify, such rights must be "deeply rooted in this Nation's history and tradition," *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977), or "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed . . . ." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

Plaintiffs assert that their fundamental right to raise children and their right to armed self-defense are at issue.

Binding precedent establishes that foster parents have no fundamental right to raise children. *See Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 843 (1977) (concluding that foster families are unlike natural families because they lacked the same blood relationship and were formed through contractual relationships and constructions of state law). Thus, the Supreme Court held that foster parents had no fundamental liberty interest deeply rooted in the Nation's history and tradition. *Id.* This Court reached the same conclusion a few years later. *Sherrard v. Owens*, 484 F. Supp. 728, 741 (W.D. Mich. 1980) (Hillman, J.), *aff'd*, 644 F.2d 542, 543 (6th Cir. 1981). While this precedent may be revisited in the future, the Court is bound by it here.

As to the latter theory, Plaintiffs' Substantive Due Process claim merges with their independent Second Amendment claim because "if a constitutional claim is covered by a specific constitutional provision, . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (citing *Graham v. Connor*, 490 U.S. 386, 393–94 (1989); *see also Turaani v. Sessions*, --- F. Supp. 3d ---, 2018 WL 2740255 (E.D. Mich. June 7, 2018) (analyzing substantive due process claim relating to gun ownership under the *Greeno* framework). There is no question that the "right to armed self-defense" is within the ambit of the Second Amendment and should not be challenged via Substantive Due Process under the rule promulgated in *Graham* and applied in *Lanier*. Accordingly, the Court will grant the motion to dismiss Plaintiffs' Substantive Due Process Claims for failure

to state a Fourteenth Amendment claim. *See, e.g.*, *Abrig v. Hall*, 295 F. Supp. 3d 874, 882 (M.D. Tenn. 2018) (dismissing Substantive Due Process claim where conduct at issue was alleged illegal seizure and plaintiff had pleaded independent Fourth Amendment claim).

<u>ORDER</u>

For the reasons stated in the accompanying Opinion, the Court **GRANTS IN PART AND DENIES IN PART** Defendant Nick Lyon's motion to dismiss. (ECF No. 7.)

Plaintiffs Brian and Naomi Mason are **DISMISSED WITHOUT PREJUDICE FROM THIS ACTION FOR LACK OF STANDING.**

**IT IS FURTHER ORDERED** that Defendant's motion to dismiss Plaintiff's Second Amendment claim (Count I) is **DENIED.**

**IT IS FUTHER ORDERED** that Plaintiffs' Equal Protection Claim (Count II) is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiffs' Substantive Due Process claim (Count III) is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

Date:  August 14, 2018                    /s/ Paul L. Maloney
                                          Paul L. Maloney
                                          United States District Judge